**GLENN DEFENSE MARINE (ASIA), PTE LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

v.

**MLS–Multinational Logistic Services Ltd., Defendant–Intervenor.**

No. 11–718C.

United States Court of Federal Claims.

Filed May 25, 2012.

Redacted Version Issued for Publication: July 17, 2012.[1]

1. This opinion was issued under seal on May 25, 2012. The parties were asked to propose redactions prior to public release of the opinion. The parties proposed joint redactions. After review by the court, this opinion is issued with the redactions determined appropriate. Where words have been redacted, it is reflected in the text of the opinion with the word "[deleted]."

The court made additional conforming redaction for consistency.

David S. Black, Holland & Knight, LLP, McLean, Va., for the plaintiff. With him was Jacob W. Scott, Holland & Knight, LLP, of counsel.

Arlene P. Groner, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Wash-

ington, D.C., for the defendant. With her was Jeanne E. Davidson, Director, Commercial Litigation Branch.

Walter A.I. Wilson, Husch Blackwell LLP, Washington, D.C., for the intervenor. With him were Daniel J. Donohue, Claude P. Goddard, Jr. and Sarah M. Graves, Husch Blackwell LLP, of counsel.

## OPINION

HORN, J.

## FINDINGS OF FACT

This case involves a post-award bid protest brought by the plaintiff, Glenn Defense Marine (Asia), PTE Ltd. (Glenn Defense Marine), and is before the court on the parties' cross-motions for judgment on the administrative record. On November 3, 2009, the Department of the Navy, Naval Supply Systems Command, Fleet Logistics Center Yokosuka (Navy) issued a Request for Proposals (RFP) N62649–09–R–0041 (the solicitation) for maritime husbanding support[2] for United States Navy ships visiting ports and operating in any one of four regions in the Western Pacific and Indian Ocean. The solicitation contemplated the award of four separate contracts, one for each one of the four regions.[3] Offerors to. the solicitation were instructed to submit separate proposals for each region for which they sought a contract. The contracts were to be awarded as firm-fixed-price, indefinite delivery/indefinite quantity contracts for one base year, with the possibility of four option years,[4] with contract performance to begin 30 days

after contract award. The solicitation indicated that the minimum quantity of each contract would be $100,000.00. Included with the solicitation was a Performance Work Statement, which identified the tasks the contractor was required to perform, including management services, sewage removal and disposal, and force protection. The Performance Work Statement stated that the contractor "shall provide timely delivery of quality goods and services at fair and reasonable prices to ships making port visits." On June 24, 2011, Contract No. N62649–11–D–0015 for Region 1 (South Asia) (the contract) was awarded to MLS–Multinational Logistic Services Ltd. (MLS). MLS is the defendant-intervenor in this case. The current protest concerns the award to MLS regarding the contract for South Asia.[5]

The solicitation's Evaluation and Source Selection Decision stated:

1. The Government will award contracts by Region resulting from this solicitation to the responsible offeror(s) whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered.

2. An offer must be acceptable, taking no exception to the terms and conditions, in order for the offeror to be eligible for award. The Government will not award a contract on the basis of an unacceptable offer. An acceptable offer shall also include an ACCEPTABLE Security Plan.

3. The Government will use the trade-off process described in FAR 15.101–1.[6] The

---

2. The solicitation defined maritime husbanding support as: "Providing supplies and services as defined in the Performance Work Statement of the contract in support of Naval forces within a port area."

3. The four regions were South Asia (Region 1) (including, among other countries, Bangladesh, Burma, India, and Sri Lanka); South East Asia (Region 2) (including, among other countries, Cambodia, China, the Philippines, Taiwan, Thailand and Vietnam); Australia, and the Pacific Islands (Region 3) (including, among other countries, Australia, New Zealand, Papua New Guinea, Fiji, French Polynesia, and Western Samoa); and East Asia (Region 4) (including countries Japan, South Korea, Mongolia, and Russia). Only Region 1 is at issue in this protest.

4. The solicitation noted that "[t]he contract also includes the clause entitled FAR 52.217–9 Option to extend the Term of the Contract. If all options are exercised under FAR 52.217–9, the duration of this contract is 66 months."

5. According to the plaintiff, Glenn Defense Marine was awarded contracts for Regions 2 and 3 pursuant to the solicitation at issue.

6. 48 C.F.R. § 15.101–1 states:
 (a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.
 (b) When using a tradeoff process, the following apply:

evaluation will assess the offeror's Technical Approach and Past Performance. This assessment will be used as a means of evaluating the offeror's ability to successfully meet the requirements of the solicitation.

4. In order to select the awardee, the Government will compare offerors' non-price factors (i.e., Technical Approach and Past Performance) and Price.

5. Consistent with the trade-off process, the Government will consider award to other than the lowest priced offeror or other than the highest rated non-price factors offeror. The Government may accept other than the lowest priced proposal.

The solicitation also stated that "[t]he following factors, in order of importance, shall be used to evaluate acceptable offers: Technical Approach, Past Performance, and Price. The non-price factors, when combined, are significantly more important than price." [7] For the Technical Approach factor, the solicitation stated that the government would evaluate the offeror's proposal based on the offeror's understanding of what is required by the contract. The three aspects of the Technical Approach factor were: understanding the requirement, management approach, and quality assurance, with each aspect given equal consideration.

For the Past Performance factor, the solicitation stated that "Past Performance is a measure of the degree to which an offeror satisfied its customers in the past by performing its contractual obligations on relevant directly related contracts and subcontracts (or partnerships or joint ventures) that are similar in scope, magnitude, and complexity to that required by the solicitation

(completed within the past 3 years or currently in progress)." The solicitation continued:

There are four areas to be reviewed: Level of Capability, Efficiency, and Effectiveness in Providing Service; Conformance to the Terms and Conditions of the Contract; Level of Reasonableness and Cooperation; and Level of Commitment to Good Customer Service. Under the Past Performance factor, each of the areas to be reviewed will be given equal consideration. Within each area, the elements making up the area will be given equal consideration. Equal consideration means equal importance.

Under the Level of Capability, Efficiency, and Effectiveness in Providing Service area, the elements were "[r]eliability and consistency of the company's key personnel," "[c]apability to manage subcontractors," and "[c]apability of managing and controlling the contract." Under the Conformance to the Terms and Conditions of the Contract area, the elements were "[p]erformance within negotiated prices," and "[t]imeliness in providing goods or services in accordance with the contract schedule." Under the Level of Reasonableness and Cooperation area, the elements were "[r]esponsiveness to changes in requirements," "[e]ase of communication," and "[t]imely response in dealing with problems and ability to find cost effective solutions." The only element of the Level of Commitment to Good Customer Service area was "[e]vidence of business practices resulting in savings to the Government or to lower overall port visit costs."

The solicitation stated that if an offeror's past performance was not similar in scope,

(1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and
(2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.
(c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must

be documented in the file in accordance with 15.406.
48 C.F.R. § 15.101–1 (current as of May 17, 2012).

7. In addition, all offerors were required to submit a security plan and address the protection of ship schedule information, security screening of contractors and subcontractor employees, and how contractor and subcontractor personnel would be recognizable to ship personnel. The security plan requirement is not at issue in this bid protest.

complexity, magnitude or otherwise was not relevant to the solicitation, the Navy would take that into account and evaluate the proposal accordingly. Section 8.2.4 of the solicitation stated:

> In the case of an offeror whose past performance is somehow not similar in scope, complexity, or magnitude, or otherwise lacks relevance to some degree then the Government will take this into consideration and evaluate accordingly (for example, a "customer" may give an offeror "outstanding" on its performance on the customer's contract, but if the contract in question is smaller or otherwise lacks relevance, then the overall rating given by the Government may be adjusted as it is less relevant).

The solicitation cautioned that in the case of an offeror without relevant past performance, that offeror may not be evaluated either favorably or unfavorably on past performance, and that the Navy would consider past performance along with the other non-price evaluation factors. The solicitation also stated that, "the proposal of an offeror with no record of relevant Past Performance or for whom information on Past Performance is not available, may not represent the most advantageous proposal to the Government, and thus may be an unsuccessful proposal when compared to the proposals of other offerors."

In order for the Navy to evaluate past performance, an offeror was required to submit a past performance matrix, as well as past performance reference information sheets for three to five customers identified on the past performance matrix. As described in the solicitation, the past performance matrix was to list and describe:

> all directly related or similar Government or commercial contracts or subcontracts currently being performed, or completed in the past three years which are similar in scope, magnitude and complexity to that which is detailed in this solicitation. The information for contracts and subcontracts shall be for relevant contracts and subcon-

tracts currently in process or completed within the past (3) [sic] years.

The Past Performance Evaluation Team received performance reference information sheets in the form of past performance questionnaires from some of the offerors' references identified on the past performance matrix. The past performance questionnaires asked the references to apply the following five ratings:

> Outstanding (O)—exceeded requirements, highest quality, extremely strong expectation of customer satisfaction;
>
> Better (B)—met requirements, exceeded some, minor problems were corrected;
>
> Satisfactory (S)—performance was adequate, corrective action addressing problems had some effect;
>
> Less than Satisfactory (LS)—did not meet requirements, corrective actions addressing serious problems had little effect.
>
> Neutral (N)—no information available[.]

The references were asked to give an overall rating of the offeror, as well to rate each of the elements within the four areas (Level of Capability, Efficiency, and Effectiveness; Conformance to the Terms and Conditions of the Contract; Reasonableness and Cooperation; and Level of Commitment to Good Customer Service).[8] The five ratings, Outstanding, Better, Satisfactory, Less than Satisfactory, and Neutral, were the same ratings that the Past Performance Evaluation Team used to rate an offeror's past performance. As indicated in the Source Selection Plan:

> The evaluation team will use the following adjectives in evaluating past performance: **OUTSTANDING (O) [VERY LOW PERFORMANCE RISK]**—The offeror's performance of previously awarded relevant contracts met or exceeded all requirements and provided exceptional performance/quality results.... The offeror's past performance record leads to an extremely strong expectation of customer satisfaction and successful performance.
>
> **BETTER (B) [LOW PERFORMANCE RISK]**—The offeror's performance of previously awarded relevant contracts met or

---

**8.** There were minor stylistic differences between the wording of the past performance question-naires and the wording of the elements as described in the solicitation.

exceeded some requirements and provided high performance/quality results.... The offeror's past performance record leads to a strong expectation of customer satisfaction and successful performance.

**SATISFACTORY [sic] [MODERATE PERFORMANCE RISK]**—The offeror's performance of previously awarded relevant contracts met requirements and provided accepted performance/quality results.... The offeror's past performance record leads to an expectation of acceptable customer satisfaction and successful performance.

**LESS THAN SATISFACTORY (LS) [HIGH PERFORMANCE RISK]**—The offeror's performance of previously awarded relevant contracts did not meet some requirements and provided marginal performance/quality results.... The offeror's past performance record leads to an expectation of marginal customer satisfaction and less than fully successful performance.

**NEUTRAL (N)**—The offeror lacks a record of relevant or available past performance history. There is no expectation of either successful or unsuccessful performance based on the offeror's past performance record.

(emphasis in original).

The solicitation stated that the Navy intended to award a single contract for each region and any proposals needed to include a price for each region for which the offeror was seeking award. For the Price factor, the solicitation stated that, "[t]he Government intends to perform price analysis using the various techniques and procedures outlined in FAR Part 15.404–1. The Government may reject an offer if prices are unbalanced or if they are other than fair and reasonable." The solicitation also indicated that total evaluated price would be "calculated by applying the offerors' proposed unit prices for 'targeted lots' to a sample of logistical requirements (LOGREQs) based upon historical port visit data for those 'targeted lots,'" which were identified in the Performance Work Statement. Furthermore, for award purposes, an offeror's evaluated price would not include port tariff items, provisions, fuel, incidentals, or any to be determined items. The final Business Clearance Memorandum explained that "the Government projects minimal visits to non-targeted ports. Many of the non-targeted ports are usually in austere locations where infrastructure is minimal and as a result, market pricing is scarce." In addition, the solicitation indicated that "[c]onsistent with the trade-off process, the Government will consider award to other than the lowest priced offeror or other than the highest rated non-price factors offeror. The Government may accept other than the lowest priced proposal."

The Navy received four proposals in response to the solicitation for Region 1, one proposal each from: plaintiff Glenn Defense Marine, intervenor MLS, [deleted], and [deleted]. The initial evaluations for the offerors in Region 1 (South Asia) were:

| Offeror | Evaluated Price | Technical | Past Performance | Security Plan |
|---|---|---|---|---|
| Glenn Defense Marine | $[deleted] | Better | Less than Satisfactory [9] | Acceptable |
| MLS | $[deleted] | Better | Better | Acceptable |
| [Deleted] | $[deleted] | Better | Satisfactory | Unacceptable |
| [Deleted] | $[deleted] | Better | Better | Acceptable |
| Independent Government Estimate | $[deleted] | | | |

9. Glenn Defense Marine was initially given a Satisfactory past performance rating by the Past Performance Evaluation Team. As indicated by the Past Performance Evaluation Team's initial Summary Report, "PPET [Past Performance Evaluation Team] rated the majority of the assessment areas as being satisfactory. This meant that the offeror's past performance record led to an expectation of acceptable customer satisfaction and successful performance. Based on the above, the PPET rated this offeror's overall rating as being 'Satisfactory.'" As discussed more fully below, the Past Performance Evaluation Team subsequently lowered Glenn Defense Marine's past performance rating to Less than Satisfactory in a revised Summary Report.

Only Glenn Defense Marine and MLS were determined to have submitted proposals which were in the competitive range for Region 1, as both [deleted] and [deleted] were eliminated from consideration after their evaluated prices were calculated. In the initial proposals, Glenn Defense Marine's evaluated price for Region 1 was $[deleted], and MLS' evaluated price for Region 1 was $[deleted], or [deleted]% higher than that of Glenn Defense Marine.

As required by the solicitation, Glenn Defense Marine submitted a past performance matrix with its past performance proposal. For Region 1, Glenn Defense Marine's past performance matrix included descriptions of 19 contracts and task orders for husbanding services in the Western Pacific and Indian Ocean. Glenn Defense Marine also submitted five past performance references with its proposal, four of which provided feedback to the Past Performance Evaluation Team. Of the four references that responded, the Past Performance Evaluation Team determined that one reference regarding Contract No. N40345–09–D–0003, for "Husbanding Services South Asia," performed by Glenn Defense Marine for the Navy in South Asia and the Indian Ocean Islands was highly relevant (the highly relevant contract), and the other three references were moderately relevant.[10] The Past Performance Evaluation Team also solicited a past performance evaluation from the then-current, contracting officer of the highly relevant contract, [deleted], Chief of the Husbanding Branch at the FLC [Navy Fleet Logistics Center] Singapore.

For the highly relevant contract, one reviewer, [deleted] of the FLC Yokosuka, Site Singapore, the lead contract specialist for the highly relevant contract, gave Glenn Defense Marine an overall evaluation of Better, while the then-current, contracting officer gave an overall evaluation of Satisfactory. For Glenn Defense Marine's three moderately relevant references, two reviewers, [deleted], who also was a reviewer on Glenn Defense Marine's

highly relevant contract, Contract No. N68047–06–D–0003 (husbanding services in Singapore), and [deleted], U.S. Naval Attaché—Kuala Lumpur, on Contract No. N68047–04–D–0001 (husbanding services in Brunei, Indonesia, Malaysia, and East Timor), gave overall evaluations of Outstanding. The final reviewer, [deleted], U.S. Naval Attaché—Bangkok, on Contract No. N40345–06–D–0001 (husbanding services in Thailand), gave an overall evaluation of Better. All the reviewers gave varied reviews for the elements in the four areas (the Level of Capability, Efficiency, and Effectiveness in Providing Service; Conformance to the Terms and Conditions of the Contract; the Level of Reasonableness and Cooperation; and the Level of Commitment to Good Customer Service). Notably, for the sole element in the Level of Commitment to Good Customer Service area, "evidence of business practices resulting in savings to the government or to lower overall port visit costs," the only ratings given by the reviewers were Satisfactory and Less than Satisfactory, with the then-current, contracting officer of the highly relevant contract, [deleted], giving Glenn Defense Marine a Less than Satisfactory rating. [Deleted] gave plaintiff three additional Less than Satisfactory ratings for the elements: ease of communication, timely response to problems and ability to find effective solutions, and performance within negotiated price.

[Deleted] also included a number of critical narrative comments in his evaluation, noting that a number of pre-visit estimates were received late, government contract specialists routinely had to request corrections, and email responses were routinely delayed. The contracting officer also stated that two negative past performance letters were sent to Glenn Defense Marine, one for not providing force protection barriers and one for failing to provide a "proposed pricing plan for insuring that non-priced items are offered at fair and reasonable prices." [Deleted], contract specialist at FLC Singapore, as a reviewer of

10. The moderately relevant references were for Contract No. N68047–06–D–0003 (husbanding services in Singapore), Contract No. N68047–04–D–0001 (husbanding services in Brunei, Indonesia, Malaysia, and East Timor), and Contract No. N40345–06–D–0001 (husbanding services in Thailand).

a moderately relevant contract, also indicated in her additional comments that Glenn Defense Marine received a negative past performance letter regarding Glenn Defense Marine's customer service not being responsive to requests.

Like Glenn Defense Marine, MLS submitted a past performance matrix with its past performance proposal, which included descriptions of 42 contracts. As required by the solicitation, MLS provided past performance reference information sheets for a number of customers identified on the past performance matrix. The Past Performance Evaluation Team sought comments from the points of contact identified on MLS' past performance reference information sheets, and ultimately received three past performance questionnaires for MLS, three past performance questionnaires for MLS' subcontractor, [deleted], and two past performance questionnaires for another MLS subcontractor, [deleted].[11] The Past Performance Evaluation Team determined that the three past performance questionnaires submitted for MLS were only moderately relevant contract references, none of which were performed in South Asia, and that the remaining four past performance questionnaires submitted for [deleted] and [deleted] were highly relevant contract references. For [deleted], a reviewer, [deleted], gave the subcontractor an Outstanding overall rating. For [deleted], two reviewers, [deleted] and [deleted], gave the subcontractor an overall rating of Better, and one, [deleted], assigned an overall rating of Outstanding. For the two reviewers assigning overall ratings of Outstanding, [deleted] and [deleted], every element, except one for [deleted] was rated Outstanding (the other rating was Better). For the two reviewers assigning ratings of Better, there was a mixture of Outstandings and Betters, and one reviewer, [deleted], assigned two ratings of Satisfactory, one for performance within the

negotiated price, and one for ease of communication.

The Past Performance Evaluation Team was comprised of three people, the Past Performance Evaluation Team Chairman, [deleted], Ashore Contracts Division, Far East Contracting Department, FISC (United States Fleet and Industrial Supply Center), Yokosuka, Japan, and two members, [deleted], Director, Policy and Oversight Division, Far East Contracting Department, FISC, Yokosuka, Japan, and [deleted], Director, Afloat Contracts Division, FISC, Yokosuka, Japan. In the Past Performance Evaluation Team's initial overall evaluation of Glenn Defense Marine's past performance, the two members of the Past Performance Evaluation Team, [deleted] and [deleted], initially found that Glenn Defense Marine's past performance was Satisfactory. [Deleted] noted in his assessment, however, "[a]lthough there were several 'Outstanding (O)' ratings on the offeror's past performance (i.e., individual questionnaires), those ratings are not substantiated by specific comments unlike several 'Less than Satisfactory (LS)' ratings." [Deleted] stated that "[c]omments in the PPI questionnaires and CPARS [Contractor Performance Assessment Reporting System] were a mixture of 'outstanding, to better, satisfactory to less satisfactory.' However, on the most highly rated (high relevancy) and some of the lesser rated (moderate relevancy) contacts, the contractor had various degrees of successes that brought performance to an acceptable level which was seen as a trend across all high and moderately relevant contracts." [12]

The assessments of [deleted] and [deleted] were adopted into the Past Performance Evaluation Team's Summary Report, prepared by the Past Performance Evaluation Team Chairman, [deleted], on October 30,

---

11. As noted in the joint stipulation of facts, "[u]pon receiving the responses, the PPET [Past Performance Evaluation Team] realized that one of the two responses on [deleted] contracts concerned a contract that had been performed prior to three years before the Solicitation closing date and the information provided was not further considered."

12. Plaintiff states that, "[n]either evaluator relied on information other than the five reference questionnaires," however, the joint stipulation of facts and the record state that [deleted] relied on "questionnaire references, CPARS [Contractor Performance Assessment Reporting System] and other government sources," and that [deleted] also relied on the past performance questionnaires.

2010, and concurred with by the two Past Performance Evaluation Team members, [deleted] and [deleted], on November 2, 2010. The Past Performance Evaluation Team's Summary Report concluded that Glenn Defense Marine should be assigned an overall rating of Satisfactory, noting "PPET rated the majority of the assessment areas as being satisfactory. This meant that the offeror's past performance record led to an expectation of acceptable customer satisfaction and successful performance. Based on the above, the PPET rated this offeror's overall rating as being 'Satisfactory.'" In its report, however, the Past Performance Evaluation Team cautioned, "[a]lthough there were some 'Outstanding (O)' ratings provided by offeror's references on the offeror's past performance (i.e., individual area questions), these positive ratings were not necessarily substantiated by convincing comments unlike several 'Less than Satisfactory (LS)' ratings."

On November 4, 2010, the Chairman of the Past Performance Evaluation Team, [deleted], forwarded the Summary Report to the Primary Contracting Officer/Source Selection Authority, [deleted], who, on the same day, forwarded a draft pre-negotiation Business Clearance Memorandum to [deleted], a member of the Naval Supply System Command Contract Review Board (Board). The draft pre-negotiation Business Clearance Memorandum reflected the Past Performance Evaluation Team's Region 1 overall past performance rating for Glenn Defense Marine as Satisfactory and the Primary Contracting Officer/Source Selection Authority determinations, as a result of which Glenn Defense Marine had been assessed a rating of "**SATISFACTORY [Moderate Performance Risk].**" (emphasis in original). The draft pre-negotiation Business Clearance Memorandum also reflected the concerns raised on the past performance questionnaires. Thereafter, Board member [deleted] raised concerns with the Primary Contracting Officer/Source Selection Authority about Glenn Defense Marine's proposals for a number of regions, including Region 1, and stated "a 'Satisfactory' rating appears dubious at best."[13] The Primary Contracting Officer/Source Selection Authority responded that: "After discussing this with the PPET Chairman, he agreed it was a borderline decision. Although there were some contract admin [sic] performance issues, on the whole, especially when considering the very positive feedback from the end user (Fleet and DAO [United States Defense Attaché Office]), the PPET felt in balance a SATISFACTORY rating was appropriate."

After indicating Glenn Defense Marine's past performance rating was a borderline decision, the Past Performance Evaluation Team Chairman reached out to the two members of the Past Performance Evaluation Team on December 16, 2010, and stated that because of the Primary Contracting Officer/Source Selection Authority's conversation with the Board member, [deleted], the Naval Supply System Command Contract Review Board was concerned that "[b]ased on the current write up and the rating definition, GDM's[14] PPI [Past Performance Information] rating for Regions 1, 2 and 3 should be 'Less than Satisfactory (High Performance Risk)' vice 'Satisfactory (Moderate Performance Risk)' unless we can beef up the existing statement for the current rating. It may be easier for us to adjust the ratings downward based on the currently available negative PPI." The Past Performance Evaluation Team Chairman urged the members, "go back to your evaluation sheets for GDM whether [sic] you can readjust the GDM's ratings for those three regions," and concluded, "[i]f it would be difficult for you to readjust them, please let me know."

The same day, December 16, 2010, one Past Performance Evaluation Team member, [deleted], replied to the Past Performance Evaluation Team Chairman, [deleted], and indicated that "based on the below guidance,[15] GMDA's PPI ratings for Region 1

---

**13.** As noted in the joint stipulation of facts, "[t]he Navy's internal procedures required review of this procurement by a contract review board ('CRB') at both local and NAVSUP [U.S. Naval Supply Systems Command] levels."

**14.** The record and the filings by the parties use both "GDM" and "GMDA" as an acronym for Glenn Defense Marine.

**15.** The "below guidance" referred to the earlier correspondence between [deleted] and the Past

through 3 have been revised." On that same day, December 16, 2010, the Past Performance Evaluation Team Chairman sent a revised Summary Report to the Primary Contracting Officer/Source Selection Authority and indicated that one of the Past Performance Evaluation Team members, [deleted], would provide the Chairman with the revised rating sheets at a later time. The Chairman stated: "Based on your guidance and advice, the PPET has revised the original ratings as shown in the attachment. . . ."

Past Performance Evaluation Team member [deleted] lowered his overall rating for Glenn Defense Marine's past performance to Less than Satisfactory. His comments included a nearly identical observation as before, "[a]lthough there were several 'Outstanding (O)' ratings on the offeror's past performance (i.e., individual questionnaires submitted by referenced personnel), those ratings are not substantiated by specific comments unlike several 'Less than Satisfactory (LS)' [sic] ratings." He added, "[a]ll information used for the above LS ratings is highly relevant to this region and also substantiated by specific and detailed comments." [Deleted] also lowered his overall rating for Glenn Defense Marine's past performance to Less than Satisfactory, and his comments were likewise similar to his earlier comments, although he noted: "Lack of effective management of subcontractors' performance and controlling contract cost had an overall effect on substandard business practices of which savings to the Government was not always maximized during port visits."

Reflecting these changes, the Past Performance Evaluation Team issued a revised Summary Report for Region 1, albeit still reflecting the dates of October 30–November 2, 2010.[16] The revised Summary Report concluded "PPET rated the majority of the assessment areas as being less than satisfactory. This meant that the offeror's past performance record led to an expectation of

marginal customer satisfaction and less than fully successful performance. Based on the above, the PPET rated this offeror's [Glenn Defense Marine's] overall rating as being 'Less than Satisfactory.' "

The Past Performance Evaluation Team issued an initial Summary Report for MLS, which also reflected the dates of October 30–November 2, 2010. In contrast to Glenn Defense Marine's Past Performance Evaluation, MLS was awarded a past performance rating of Better, with the summary notes indicating, "PPET rated the [sic] most of the assessment areas as being better. The offeror was very cooperative and committed to customer service. This meant that the offeror's past performance record led to a strong expectation of customer satisfaction and successful performance. Based on the above, the PPET rated this offeror's overall rating as being 'Bette.' " In the Summary Report for MLS, for each area of Past Performance, Level of Capability, Efficiency, and Effectiveness in Providing Service; Conformance to the Terms and Conditions of the Contract; Level of Reasonableness and Cooperation; and Level of Commitment to Good Customer Service, and each element of each area, the PPET noted that there were "no major issues or weaknesses. . . ." MLS' past performance rating, although re-evaluated, was not revised by the Past Performance Evaluation Team.

After the initial evaluations were completed, the Primary Contracting Officer/Source Selection Authority prepared the pre-negotiation Business Clearance Memorandum to seek approval to establish a competitive range and open discussions, which was approved on December 30, 2010. As noted by the Primary Contracting Officer/Source Selection Authority, "[b]ased on the evaluation criteria of the solicitation the Contracting Officer has determined that GDM and MLS are the most highly rated proposals and should be retained in the competitive range."

Performance Evaluation Team Chairman, described above.

**16.** At oral argument, plaintiff indicated that the Navy reevaluated Glenn Defense Marine's past performance rating downward in three of the four regions, Regions 1, 2, and 3. There is no

information in the record regarding Region 4. Plaintiff also noted that Glenn Defense Marine, nonetheless, was awarded the contracts for Regions 2 and 3 with a Less than Satisfactory past performance rating.

The Primary Contracting Officer/Source Selection Authority continued, Glenn Defense Marine's "proposal is highly rated since it has the lowest overall price, a technical proposal rated as **BETTER,** past performance rated as **LESS THAN SATISFACTORY,** and an **ACCEPTABLE** security plan. MLS's proposal is also highly rated since it has the second lowest evaluated price which is considered competitive, a technical proposal rated as **BETTER,** past performance rated as **BETTER,** and an **ACCEPTABLE** security plan." (emphasis in original).

As noted in the final Business Clearance Memorandum, "[t]he purpose of the discussions were [sic] to point out weaknesses or deficiencies in the offeror's technical approach; provide an opportunity to respond to any negative or missing past performance information; and identify pricing outliers that were considered high or low." On January 4, 2011, the Primary Contracting Officer/Source Selection Authority raised eight past performance issues with Glenn Defense Marine, based on comments in the past performance questionnaires, including key personnel being less than responsive, significant differences between estimated prices and final invoices, purchasing plans never provided to the government, failure to obtain the required compensation for nonpriced items, and communications difficulties in reaching Glenn Defense Marine personnel. Glenn Defense Marine timely responded in writing to the issues raised by January 18, 2011.[17]

In the final Past Performance Evaluation Team Summary Report, both members of the Past Performance Evaluation Team noted Glenn Defense Marine's response to the discussion questions and the proposed corrective actions Glenn Defense Marine indicated it would take, but both members also noted that the proposed corrective actions in response to the discussion questions could not be verified. [Deleted] wrote: "The offeror submitted additional information as a result of the PPI discussions with the KO.... [T]he offeror provided responses (including corrective actions being taken/to be taken) to the issues stated above. However, the majority of them cannot be verified now or does [sic] not fully address issues/deficiencies although some of their responses seem reasonable to resolve them."

The Primary Contracting Officer/Source Selection Authority noted that:

> The PPET reviewed GDM's responses to the 8 past performance issues. Based upon GDM's responses, the PPET's overall rating for GDM did not change. The PPET determined that GDM's response to the past performance issue about subcontractor management satisfactorily resolved the concerns with that past performance issue. GDM's response to the other 7 issues did not satisfactorily resolve the past performance concerns raised by the PPET.

Each offeror in the competitive range was afforded an opportunity to submit a final revised proposal. Both Glenn Defense Marine and MLS timely submitted final revised proposals on February 22, 2011. The final evaluations for the remaining two offerors were:

| Offeror | Evaluated Price | Technical | Past Performance | Security Plan |
|---|---|---|---|---|
| **Glenn Defense Marine** | $1,548,200.00 | Better | Less than Satisfactory [18] | Acceptable |
| **MLS** | $2,537,414.00 | Better | Better | Acceptable |
| **Independent Government Estimate** | $[deleted] | | | |

17. The Primary Contracting Officer/Source Selection Authority also sent price related and technical questions to Glenn Defense Marine and to MLS. The Primary Contracting Officer/Source Selection Authority did not send MLS any past performance questions. MLS also timely responded to the discussion questions.

18. As noted above, Glenn Defense Marine was initially given a Satisfactory past performance rating by the Past Performance Evaluation Team, but the Past Performance Evaluation Team subsequently lowered Glenn Defense Marine's past performance rating to Less than Satisfactory in its revised Summary Report.

As in the initial evaluation, Glenn Defense Marine and MLS both achieved a Technical Approach rating of Better and each of their security plans was deemed acceptable in the final evaluation. Similarly, as in both the initial evaluation and in the final evaluation, Glenn Defense Marine's past performance rating was Less than Satisfactory, while MLS' past performance rating was Better. In its revised proposal, MLS' price of $2,537,414.00 was $989,214.00 higher, or approximately 64% higher than Glenn Defense Marine's price of $1,548,200.00.

Regarding the past performance rating for Glenn Defense Marine in the final, February 23, 2011,[19] evaluation, the Past Performance Evaluation Team's Summary Report indicated:

> For Region 1, this offeror's [Glenn Defense Marine's] past performance on previously awarded relevant contracts did not meet some significant requirements. Although the offeror was generally responsive to changes in requirements, provided timely services and had reasonably good control over managing subcontractors, there were several noted deficiencies in its performance when it came to the reliability and consistency of its customer service practices, transparency in pricing and ease of communications. Overall, the offeror was less than fully cooperative and did not demonstrate a commitment to service. The corrective actions taken have not demonstrated the offeror's effectiveness. Proposed corrective actions lacked sufficient details for the PPET to determine the offeror's effectiveness in addressing the deficiencies. Therefore, based upon the offeror's past performance record, it leads the PPET to expect marginal customer satisfaction and less than fully successful performance.

The Primary Contracting Officer/Source Selection Authority subsequently issued a final Business Clearance Memorandum, dated April 7, 2011, and agreed with the Less than Satisfactory past performance rating for Glenn Defense Marine. The Primary Contracting Officer/Source Selection Authority identified specific past performance issues for Glenn Defense Marine, including: "[m]ultiple concerns were expressed by Government officials regarding key personnel's responsiveness to correspondence; proposed corrective [sic] lack sufficient details to determine their anticipated effectiveness." Glenn Defense Marine "failed to demonstrate that they met contract competition requirements for non-priced items over $3,000," and Glenn Defense Marine "failed to provide supporting documentation to substantiate proposed prices for nonpriced items." The Primary Contracting Officer/Source Selection Authority also noted that "[t]here were documented instances where contracting personnel encountered communications difficulties with GDM; proposed corrective [sic] lacked sufficient details to determine their [Glenn Defense Marine's] anticipated effectiveness."

The Primary Contracting Officer/Source Selection Authority continued:

> GDM's final overall past performance rating was considered **LESS THAN SATISFACTORY** by the PPET. According to the PPET, GDM [sic] past performance on previously awarded contracts did not meet some significant requirements. Although GDM was generally responsive to changes in requirements, provided timely services and had reasonably good control over managing subcontractors, there were several noted deficiencies in their performance when it came to reliability and consistency of its customer service practices, transparency in pricing and ease of communications.

(emphasis in original). The Primary Contracting Officer/Source Selection Authority concluded that, "[t]he Contracting Officer has reviewed the PPET's final evaluation report and concurs with the PPET's final rating of **LESS THAN SATISFACTORY [HIGH PERFORMANCE RISK]**." (emphasis in original).

---

19. The Past Performance Evaluation Team final Summary Report for Glenn Defense Marine is dated February 23, 2011, but was not concurred with by the two team members until February 24, 2011.

By contrast, regarding the past performance of MLS in the final evaluation, dated February 23, 2011,[20] the Past Performance Evaluation Team's Summary Report indicated that:

> For Region 1, this offeror's past performance on previously awarded relevant contracts met or exceeded the [sic] most requirements. The offeror was very responsive to customer service issues, provided timely services, flexible when responding to changes in requirements, maintained control over managing subcontractors, was transparent in its pricing processes and was effective in communications. Overall, the offeror was very cooperative and demonstrated a commitment to customer service. There were no substantiated problems or issues documented in this past performance assessment. Therefore, based upon the offeror's past performance record, it leads the PPET to expect a strong customer satisfaction and fully successful performance.

In reviewing MLS' past performance, the Primary Contracting Officer/Source Selection Authority stated that, "MLS had no past performance issues for discussions and their final rating remained unchanged." The Primary Contracting Officer/Source Selection Authority highlighted specific past performance instances in which MLS exceeded requirements, including "[c]onsistently provided a high level of customer service as the prime [contractor] as well as through their subcontractors," "[h]igh level of customer satisfaction," "[v]ery responsive to customer inquiries and timely with pre-visit cost estimates," and "[r]esponsive to providing cost effective solutions." The Primary Contracting Officer/Source Selection Authority also noted that "[p]erformance risk for MLS meeting all contract requirements is considered **low**." (emphasis in original). The Primary Contracting Officer/Source Selection Authority concluded that "[t]he Contracting Officer has reviewed the PPET's final evaluation report and concurs with the PPET's

final rating of **BETTER [LOW PERFORMANCE RISK]**." (emphasis in original).

As indicated above, in its revised proposal, MLS' price of $2,537,414.00 was $989,214.00, or approximately 64% higher than Glenn Defense Marine's price of $1,548,200.00. The Primary Contracting Officer/Source Selection Authority noted that although the two offerors' technical evaluations were relatively equal, "the fact that MLS's past performance was significantly higher than GDM's past performance, supports MLS being rated higher in terms of their ability to successfully meet all the requirements of the solicitation," thus "[w]hen combining the non-price factors together, MLS is rated higher than GDM." The Primary Contracting Officer/Source Selection Authority stated that because of the difference in price, a trade-off analysis was required to determine the best value proposal to the Navy. After the analysis, "[t]he Contracting Officer has determined MLS's proposal to be the 'best value' and most advantageous to the Government." The Primary Contracting Officer/Source Selection Authority emphasized that "GDM had significant deficiencies in meeting both pricing submission requirements as well as responding in a timely manner to facilitate pricing transparency." Moreover, "GDM's past performance leads the Contracting Officer to believe the additional contract administration costs would be required if a contract were awarded to GDM rather than MLS." The Primary Contracting Officer/Source Selection Authority concluded that "[t]he perceived benefits and substantially lower risk, although not easily quantifiable, are considered to be worth more than the $989,214 price difference. Therefore, the source selection decision is to award the contract for the South Asia region to **MLS**." (emphasis in original).

The contract was awarded to MLS on June 24, 2011. Glenn Defense Marine filed a protest at the Government Accountability Office (GAO) on July 5, 2011, which was denied on October 13, 2011. *See In re Glenn Defense Marine–Asia PTE, Ltd.*, B– 402687.6, B– 402687.7, 2011 WL 6947628 (Comp.Gen. Oct. 13, 2011). The protest before the GAO al-

---

**20.** As with Glenn Defense Marine, the Past Performance Evaluation Team final Summary Report for MLS is dated February 23, 2011, but was not concurred with by two team members until February 24, 2011.

leged that the Navy should have rated Glenn Defense Marine's technical proposal superior to MLS, and disagreed with the past performance rating of Better for MLS and Less than Satisfactory for Glenn Defense Marine. *See id.* at *4, *7–*8. Regarding the technical evaluation, the GAO noted that the evaluation of proposals is within the discretion of the contracting agency, highlighted the major strengths identified in MLS' proposal, and concluded that, "the agency's evaluation of the proposals as technically equal was reasonable." *Id.* at *6. Regarding the past performance evaluation of Glenn Defense Marine, the GAO noted that although Glenn Defense Marine believed it was entitled to a higher past performance rating, it did not disagree with many of the negative comments about its past performance, only how the negative comments were weighted in its evaluation. *Id.* at *7. The GAO stated, absent a showing of why the conclusions were unreasonable, the GAO had "no basis" to determine the Navy had evaluated Glenn Defense Marine's past performance in a way that was inconsistent with the solicitation. *Id.* The GAO concluded, "[i]n our view, the Navy reasonably concluded that MLS's past performance offered a clear advantage over the past performance of GDMA, and the Navy reasonably documented its decision to select MLS over GDMA for this reason. The protest is denied." *Id.* at *8. After its protest was denied at the GAO, plaintiff filed its bid protest in this court.[21] The parties have filed cross-motions for judgment on the administrative record.

## DISCUSSION

### Standard of Review

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320,

§§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2006)), amended the Tucker Act, providing the United States Court of Federal Claims with a statutory basis for bid protests. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330–32 (Fed.Cir.2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir. 1970) and the line of cases following that decision. *See, e.g., Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed. Cir.) (citing *Scanwell Laboratories, Inc. v. Shaffer* for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), *reh'g denied* (Fed.Cir.2004); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004) ("Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332)); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2003).

◼ Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observ-

---

21. Although the GAO decision notes that "[t]he protester has attacked virtually every aspect of the technical and past performance evaluations," *In re Glenn Defense Marine-Asia PTE, Ltd.,* 2011 WL 6947628, at *3, in the case before this court, Glenn Defense Marine is only challenging the past performance evaluation in its bid protest. Prior to filing the above captioned case, however, plaintiff filed an earlier, pre-award bid protest related to the same solicitation as is at issue in the above captioned case, also in the United States Court of Federal Claims, which was subsequently denied. *See Glenn Defense Marine (Asia) PTE, Ltd. v. United States,* 97 Fed.Cl. 568, *appeal*

*dismissed,* 459 Fed.Appx. 906 (Fed.Cir.2011). In the pre-award bid protest, a Judge of the Court of Federal Claims determined that the price evaluation methodology in the solicitation challenged by Glenn Defense Marine was not arbitrary or capricious or not in accordance with law. *See id.* at 571. Although Glenn Defense Marine initially filed an appeal to the United States Court of Appeals for the Federal Circuit, plaintiff subsequently filed a notice of withdrawal and the appeal was dismissed. *See Glenn Defense Marine (Asia) PTE Ltd. v. United States,* 459 Fed.Appx. 906 (Fed.Cir.2011).

ance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006);[22] *see also Savantage Fin. Servs., Inc. v. United States,* 595 F.3d 1282, 1285–86 (Fed.Cir.2010); *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358 (Fed.Cir.2009); *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed.Cir.2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1312 (Fed.Cir.2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005); *Contracting, Consulting, Eng'g LLC v. United States,* 104 Fed.Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Turner Constr. Co., Inc. v. United States,* 645 F.3d 1377, 1383 (Fed.Cir.2011) (quoting *PAI Corp. v. United States,* 614 F.3d 1347, 1351 (Fed.Cir.2010)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332 n. 5; *see also NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.), *reh'g denied* (Fed.Cir.2000))); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

---

**22.** The full language of 5 U.S.C. § 706 of the Administrative Procedures Act provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Alabama Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed.Cir.2009); *In re Sang Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision.... The reviewing court is thus enabled to perform a meaningful review ...."), *aff'd on subsequent appeal,* 262 Fed.Appx. 275 (Fed.Cir.2008); *Textron, Inc. v. United States,* 74 Fed.Cl. 277, 285–86 (2006), *appeal dismissed* sub nom. *Textron, Inc. v. Ocean Technical Servs., Inc.,* 222 Fed.Appx. 996 (Fed.Cir.2007);

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Contracting, Consulting, Eng'g LLC v. United States,* 104 Fed.Cl. at 339–40; *Textron, Inc. v. United States,* 74 Fed.Cl. at 285; *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir.2001). The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion of an actual or apparent conflict is not enough." *PAI Corp. v. United States,* 614 F.3d at 1352 (citing *John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1300 (Fed.Cir.1999); *C.A.C.I., Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) and *Filtration Dev. Co., LLC v. United States,* 60 Fed.Cl. 371, 380 (2004)).

■ Furthermore, to prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First ... the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second ... if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

*Bannum, Inc. v. United States,* 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.' ") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (Fed.Cir.1999) (citation omitted in original); *see also Allied Tech. Grp., Inc. v. United States,* 649 F.3d 1320, 1326 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2011); *Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331; *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Myers In-*

*vestigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1342 (Fed.Cir.2000); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir. 2000).

In *Data General Corporation v. Johnson,* the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.-Fed.,* 719 F.2d at 1574.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1996); *see also Bannum, Inc. v. United States,* 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum.... To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); and *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562)); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial

chance it would have received the contract award but for that error.'" (quoting *Statistica, Inc. v. Christopher,* 102 F.3d at 1582)); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d at 1370 (using the "substantial chance" standard); *OMV Med., Inc. v. United States,* 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057 (using a "reasonable likelihood" rule); *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d at 1380 (using a "substantial chance" test); *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 96 (2006) (using a "substantial chance" test), *recons. in part,* 75 Fed.Cl. 406, 412 (2007) (using a "substantial chance" test); *Park Tower Mgmt., Ltd. v. United States,* 67 Fed.Cl. 548, 559 (2005) (using a "substantial chance" test).

■■■ Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); *see also R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed.Cir.2003) (citing *Ray v. Lehman,* 55 F.3d 606, 608 (Fed.Cir.) *cert. denied* 516 U.S. 916, 116 S.Ct. 304, 133 L.Ed.2d 209 (1995)). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also HP Enter. Servs., LLC v. United States,* 104 Fed.Cl. 230, 238–39 (2012); *Vanguard Recovery Assistance v. United States,* 101 Fed.Cl. 765, 780 (2011); *Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003) (quoting *Honeywell, Inc. v. United*

*States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301)).

■ As stated by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 6–7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Co–Steel Raritan, Inc. v. ITC,* 357 F.3d 1294, 1309 (Fed.Cir.2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *In re Sang Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438)); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993); *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *ManTech Telecomms. & Info.*

*Sys. Corp. v. United States,* 49 Fed.Cl. 57, 63 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir. 2002); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))).

■ A contracting officer has broad decision making discretion in the procurement process. In *Garufi,* the United States Court of Appeals for the Federal Circuit wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' " *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner],* 480 F.2d [1166,] 1169 [ (D.C.Cir.1973) ]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also Allied Tech. Grp., Inc. v. United States,* 649 F.3d at 1326; *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Banknote Corp. of Am. v.*

*United States,* 365 F.3d at 1351; *OMV Med., Inc. v. United States,* 219 F.3d at 1343.

The United States Court of Appeals for the Federal Circuit also has stated: Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 617 F.2d 590, 598 (Ct.Cl.1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69....

*Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d at 958–59; *see also Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 995; *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994); *Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958; *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001).

Similarly, the Federal Circuit has indicated that:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." *CHE Consulting, Inc. v. United States,* 552 F.3d 1351, 1354 (Fed.Cir.2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United*

*States,* 216 F.3d 1054, 1058 (Fed.Cir.2000) (alterations added).

*PAI Corp. v. United States,* 614 F.3d at 1351; *see also Weeks Marine, Inc. v. United States,* 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.' ") (quoting *CHE Consulting, Inc. v. United States,* 552 F.3d at 1354 (quoting *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058)).

■ The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. *See Compubahn, Inc. v. United States,* 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); *see also Textron, Inc. v. United States,* 74 Fed.Cl. at 286 (in which the court considered technical ranking decisions are " 'minutiae of the procurement process' " not to be second guessed by a court) (quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996)). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.

The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others. For example, in a negotiated procurement, contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements. *See Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid

protests.") (citations omitted); *see also Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement. . . ." (citing *Sperry Flight Sys. v. United States*, 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977))). In *Burroughs Corporation v. United States*, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in *Sperry Flight Systems Division v. United States*, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for . . ." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also Am. Tel. and Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed.Cir.2002), *reh'g en banc denied* (Fed.Cir.), *cert. denied*, 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995); *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 64.

 When the contracting officer's discretion grows, so does the burden on the protestor. As noted recently in *D & S Consultants, Inc. v. United States*:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. *DynCorp Int'l v. United States*, 76 Fed.Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. *Id.* Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." *Id.*

*D & S Consultants, Inc. v. United States*, 101 Fed.Cl. 23, 33 (2011). *D & S Consultants* identifies another circumstance in which the contracting officer is afforded yet greater discretion. As *D & S Consultants* explains, procurements in which a best-value determination is made affords the contracting officer broader decision making discretion than a negotiated procurement in which a best-value determination is not at issue. *See id.; see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); *PHT Supply Corp. v. United States*, 71 Fed.Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.' ") (citations omitted). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d at 1355 (citing *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *E.W. Bliss Co. v. United States*, 77 F.3d at 449; and *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 958–59); *see also Am. Tel. and Tel. Co. v. United States*, 307 F.3d at 1379; *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 958.

In *E.W. Bliss Co. v. United States*, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in negotiated procurements and best value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v.*

*Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B- 251969.5, B- 251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

* * *

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") . . . .

*E.W. Bliss Co. v. United States,* 77 F.3d at 449; *see also Vanguard Recovery Assistance v. United States,* 101 Fed.Cl. at 780; *Galen Med. Assocs., Inc. v. United States,* 74 Fed. Cl. 377, 383–84 (2006); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (Fed.Cir.2002).

Plaintiff brings three related counts before this court. In Count I, plaintiff alleges that the Navy did not evaluate Glenn Defense Marine's past performance in accordance with the solicitation and that it should not have received an overall Less than Satisfactory past performance rating. In Count II, plaintiff alleges that the Navy did not evaluate the intervenor MLS', past performance in accordance with the solicitation and that its determination that MLS' past performance was rated Better lacked a rational basis. In Count III, plaintiff alleges that the Navy's best value determination lacked a rational basis, noting that MLS' proposed price was 63.8% higher than the price proposed by Glenn Defense Marine. Plaintiff also asserts that the Navy's determination that MLS' proposal presented the best value over Glenn Defense Marine was based entirely on the determination that MLS' past performance rating was superior to Glenn Defense Marine's past performance rating, and, according to plaintiff, "any best value determination based on the past performance evaluations of GDMA and MLS as they currently stand is arbitrary, capricious, and a violation of procurement laws and regulations." Plaintiff, therefore, states that "the record shows that the Agency's past performance evaluations of GDMA and MLS were arbitrary, capricious, an abuse of discretion, and not in accordance with law and that these errors likewise tainted the best value determination that was based on these improper evaluations."

Plaintiff seeks a permanent injunction to prevent MLS from performing under the contract awarded pursuant to the solicitation. Plaintiff also seeks to enjoin the Navy from authorizing performance until it reevaluates both Glenn Defense Marine's past performance and MLS' past performance ratings, as well as the best value determination. Plaintiff argues that, "[b]ecause GDMA will succeed on the merits of this protest and because the other factors weigh heavily in favor of this Court issuing an injunction requiring the Agency to cease performance of the contract awarded to MLS, conduct a re-evaluation of proposals and make a new best value determination, this Court should grant the injunctive relief GDMA seeks and award GDMA its bid preparation and proposal costs."

### Past Performance

Plaintiff asserts that Glenn Defense Marine's past performance rating of Less than Satisfactory was arbitrary, capricious and lacked a rational basis. Plaintiff alleges that

the Agency improperly relied "almost entirely on five past performance questionnaires that were completed by individuals familiar with GDMA's past performance." According to plaintiff, the Agency failed to explain how plaintiff's past performance warranted a rating of Less than Satisfactory when two of the past performance reviews, which were deemed "highly relevant," were rated Satisfactory or Better. Furthermore, plaintiff claims that the Agency acted wrongfully when it relied on negative comments within the questionnaires, each of which had assigned an overall rating of Satisfactory or higher. The plaintiff also asserts that because the Navy did not properly evaluate MLS' past performance, the MLS past performance rating of Better was arbitrary, capricious and lacked a rational basis. Plaintiff argues that the Navy's determination that the MLS' subcontractors' reference questionnaires on past performance were highly relevant "was based solely on the fact that the contracts were performed in South Asia," and that the Navy "has no rational basis for concluding that these references are of similar scope, magnitude, or complexity to the scope of work of the contract." By contrast, the defendant argues that the plaintiff has not demonstrated that the Navy's evaluation of either Glenn Defense Marine or MLS was arbitrary, capricious, or otherwise not in accordance with law. The intervenor agrees with the defendant.

■■■■ As a Judge of the United States Court of Federal Claims explained, "[i]n the bid protest context, the assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.' " *Todd Constr., L.P. v. United States,* 88 Fed. Cl. 235, 247 (2009) (quoting *Clean Venture, Inc.,* B– 284176, 2000 CPD ¶ 47, 2000 WL 253581, at *3 (Comp.Gen. Mar. 6, 2000)), *aff'd,* 656 F.3d 1306 (Fed.Cir.2011); *see also Al Andalus Gen. Contracts Co. v. United States,* 86 Fed.Cl. 252, 264 (2009) ("It is well-recognized that an agency's evaluation of past performance is entitled to great defer-

ence."); *SP Sys., Inc. v. United States,* 86 Fed.Cl. 1, 23 (2009) ("[P]ast performance evaluation 'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.' " (quoting *Consolidated Eng'g Servs., Inc. v. United States,* 64 Fed.Cl. 617, 637 (2005))). " 'When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency." ' " *First-Line Transp. Sec., Inc. v. United States,* 100 Fed.Cl. 359, 396 (2011) (quoting *Univ. Research Co. v. United States,* 65 Fed.Cl. 500, 505 (2005) (quoting *Gulf Grp. Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004))); *see also Fort Carson Support Servs. v. United States,* 71 Fed.Cl. 571, 598 (2006) ("Evaluation of past performance is 'within the discretion of the contracting agency and will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.' ") (quoting *Consolidated Eng'g Servs. v. United States,* 64 Fed.Cl. at 637); *Overstreet Elec. Co., Inc. v. United States,* 59 Fed.Cl. 99, 117 (2003) ("And when a procurement involves performance standards . . . a court must grant *even more* deference to the evaluator's decision." (citing *E.W. Bliss Co. v. United States,* 77 F.3d at 449)), *appeal dismissed,* 89 Fed. Appx. 741 (Fed.Cir.2004) (emphasis in original). Likewise, the Court in *Seaborn Health Care, Inc. v. United States,* 101 Fed.Cl. 42 (2011), wrote:

A similar deferential standard applies when the Court is reviewing an agency's assessment of past performance evaluations. *Commissioning Solutions Global, LLC v. United States,* 97 Fed.Cl. 1, 9 (2011) ("[I]n cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a 'triple whammy of deference.' ") (quoting *Gulf Grp. Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004)); *see also Blackwater Lodge & Training Center Inc. v. United States,* 86 Fed.Cl. 488, 493 (2009) ("mere disagree-

ment" with past performance evaluations is insufficient to disturb agency's decision). *Seaborn Health Care, Inc. v. United States*, 101 Fed.Cl. at 48. Continuing, the court stated:

> In evaluating an offeror's past performance, FAR 15.305(a)(2) affords agencies considerable discretion in deciding what data is most relevant. *PlanetSpace Inc. v. United States*, 92 Fed.Cl. 520, 539 (2010). "Thus, when evaluating an offeror's past performance, the [contracting officer] 'may give unequal weight,' or no weight at all, 'to different contracts when [the contracting officer] views one as more relevant than another.'" *Linc Gov't Servs., LLC v. United States*, 96 Fed.Cl. 672, 718 (2010) (quoting *SDS Int'l, Inc. v. United States*, 48 Fed.Cl. 759, 769 (2001)).

*Seaborn Health Care, Inc. v. United States*, 101 Fed.Cl. at 51 (alterations in original); *see also Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. at 787. In *Vanguard Recovery Assistance v. United States*, the court noted the "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference.'" *Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. at 785 (quoting *Al Andalus Gen. Contracts Co. v. United States*, 86 Fed.Cl. at 264 (citing *Westech Int'l, Inc. v. United States*, 79 Fed.Cl. 272, 293 (2007))).

*Glenn Defense Marine*

Plaintiff argues that "[t]he evaluation of GDMA's past performance as 'Less than Satisfactory' was arbitrary and capricious because it was counter to the information before the Agency—the five references that assessed GDMA's overall performance as 'Outstanding,' 'Better,' and 'Satisfactory.'" Stated otherwise, plaintiff argues the "Agency's evaluation of GDMA's past performance as 'Less than Satisfactory' is also arbitrary, capricious, and an abuse of discretion because the PPET failed to articulate a rational connection between its 'Less than Satisfactory' rating and the much higher overall ratings of the five past performance references on which the PPET relied."

The parties agree that, initially, the Past Performance Evaluation Team assigned Glenn Defense Marine a past performance rating of Satisfactory, and that the past performance questionnaires gave Glenn Defense Marine's past performance overall ratings of Outstanding, Better, and Satisfactory. Defendant states, "it is undisputed that the members of the PPET initially found GDMA's past performance to be Satisfactory after reviewing five past performance reference questionnaires," but argues that the Agency's revision of plaintiff's past performance evaluation to Less than Satisfactory was based on information before the evaluators and was not "arbitrary, capricious, or unlawful." Although the Past Performance Evaluation Team changed the plaintiff's initial Past Performance rating from Satisfactory to Less than Satisfactory, plaintiff does not argue that a Past Performance Evaluation Team or an Agency can never change an evaluation. At oral argument, counsel for plaintiff stated: "They could if they had additional information. I want to be clear. I'm not saying they can never change it. They'd have to go get some additional information. Call, flesh it out. Have this be a thoughtful process, a reasoned process." Glenn Defense Marine also does not allege bad faith on the part of the government, rather, plaintiff only alleges that the government improperly analyzed the information available to the Past Performance Evaluation Team. Although it is not surprising that the plaintiff questioned defendant's quick revision of Glenn Defense Marine's overall past performance rating, the court must review the propriety of the re-evaluation by the Past Performance Evaluation Team based on all the information available to the Agency. The ultimate issue is whether the Navy's award decision was unsupportable or arbitrary and capricious.

Plaintiff's claims raise the issue of whether the Past Performance Evaluation Team was obligated to adopt the overall rating labels on the past performance questionnaires, which gave Glenn Defense Marine overall ratings of Better and Satisfactory for the highly relevant contract, as well as overall ratings of Outstanding and Better for the moderately relevant contracts. Alternatively, was the Past Performance Evaluation Team permitted, as it did, to look beyond the overall past

performance rating and consider the underlying narrative comments included in the past performance questionnaires, as well as other information, in order to revise the overall labels and reach a different final overall rating. Although it would have been far preferable for the Agency personnel, including the Past Performance Evaluation Team, to have done a complete analysis initially before submitting its first overall past performance rating for plaintiff in Region 1, the additional comments submitted as part of the responsive questionnaires were relevant sources of information which could provide a more complete perspective of a prospective bidder's past performance, as was the information provided by the then-current, contracting officer, [deleted].

Most notably, the comments from the then-current, contracting officer, [deleted], for Glenn Defense Marine's highly relevant contract, demonstrate a disconnect between his overall rating of Satisfactory and the past performance of Glenn Defense Marine. Moreover, [deleted]'s additional comments revealed a great deal of information, not available from an overall rating alone. [Deleted]'s comments state in full:

1–6 of 9 pre-visit estimates for port visits covered by this contract from 27 OCT 09–present were received late. In addition, the contract specialists at FISC Det. Singapore routinely have to request corrections to the PCEs received for port visits (e.g., not all items requested in LOGREQ [logistical requirements] are included in the PCE [pre-visit cost estimates]).

2–A negative past performance letter regarding the USS LASSEN and USS Shiloh port visits to Goa, India was sent to GDMA on 6 July 10. GDMA did not provide force protection barriers as specified by the ships in their ordering LOGREQs. A complaint from State Department personnel in Goa led to the issuance of this past performance letter.

3–A negative past performance letter regarding performance under this contract was sent to GDMA on 14 JUN 10. GDMA has not provided a proposed pricing plan for insuring that non-priced items are offered at fair and reasonable prices. This pricing plan is a deliverable specified under this contract. Fair and reasonable pricing for non-priced items is an unresolved issue under this contract. The FISC Det. Singapore office has yet to receive competitive price quotations for any non-priced services provided under this contract.

4–Email responses from GDMA representatives to questions from the FISC Det. Singapore contract specialists are routinely delayed. The delayed responses exacerbate the short lead time for arranging port visit services.

For the other highly relevant contract reference, [deleted] of FLC Yokosuka, Site Singapore, in her additional comments stated, in part, "[t]heir prices for the non-contract are rather high and attempt to negotiate the cost seems pointless," and noted that "[n]o major issues under the purview of this contract except the DAO Representative in India complained about their service during the USS Shiloh and USS Lassen visit to GAO in Apr 10. He complained about GDMA inability to provide pier side force protection services utilizing containers. The pier was not cordoned off appropriately. FISC Det Singapore Contracting Officer issued a negative past performance letter addressing this issue." [23]

Moreover, some of the comments offered in the questionnaire submitted to the Past Performance Evaluation Team by [deleted], the Naval Attaché in Kuala Lumpur, for one of Glenn Defense Marine's moderately relevant contracts, shed light on the weight to be placed on the Captain's overall rating of Outstanding. Although [deleted]'s overall rating for Glenn Defense Marine's past performance was Outstanding, and, for each element he rated, he concluded Glenn Defense Marine's past performance was Outstanding, he

---

23. [Deleted] also stated, "GDMA has the capability to provide services in remote locations such as Port Blair," and "[t]hey are very professional and their staffs are very knowledgeable and experience [sic]." These comments likely informed her decision to assign Glenn Defense Marine an overall rating of Better, despite the other concerns she identified above regarding price and the inability to provide pier side service, resulting in a negative past performance letter.

noted for the element "performance within the negotiated price," "UNKNOWN—I'm not involved with the price side of the contract," and for the element "business practices resulted in savings to the Government or lowered overall port visit costs," he stated "I have no idea, I'm not a FISC or SUPPLY officer, don't have visibility on the overall cost of port visits." [Deleted]'s overall rating, thus, had limited application without considering his internal comments, which were more specific and directed. Similarly, [deleted]'s reference for the moderately relevant contract gave an overall rating of Outstanding, but she noted in her additional comments that a negative past performance letter was issued to Glenn Defense Marine regarding "GMDA Customer Service representative not being responsive to their [the USS Cowpens] request."

Ultimately, the Past Performance Evaluation Team reviewed and considered the internal comments in the narrative statements in the past performance questionnaires to reach overall Past Performance ratings for Region 1. This is reflected in both the individual Past Performance Evaluation Team members' assessments and the Past Performance Evaluation Team Summary Report. [Deleted] noted in his assessment, however, "[a]lthough there were several 'Outstanding (O)' ratings on the offeror's past performance (i.e., individual questionnaires), those ratings are not substantiated by specific comments unlike several 'Less than Satisfactory (LS)' ratings." Moreover, the Past Performance Evaluation Team's Summary Report noted concerns raised by the additional comments and indicated, "when questioned about declining performance issues, this offeror was non-responsive to inquiries at times. Changes to existing terms and conditions were [sic] delayed performance to start in some areas," and cited "deficiencies in its performance when it came to the reliability and consistency of its customer service practices, transparency in pricing and ease of communications."

The pre-negotiation Business Clearance Memorandum synthesized the information in the past performance questionnaires and the Summary Reports. The pre-negotiation Business Clearance Memorandum, like the Summary Reports, assigned Glenn Defense Marine's past performance an overall Satisfactory rating [moderate performance risk], but noted potential major past performance issues, such as "[t]here were multiple complaints about GDM's customer service representative being less than responsive to Government inquiries," and Glenn Defense Marine "failed to provide a proposed pricing plan to ensure non-priced items were offered at fair and reasonable prices, although it was a deliverable under the contract N40345–09–D–0003. Although GDM stated they would provide the plan at a later date, a plan was never received." The above demonstrates the legitimate concerns the Navy had even before reconsideration of plaintiff's initial overall past performance rating.

Moreover, the revised evaluation of Glenn Defense Marine's past performance rating as Less than Satisfactory by the Past Performance Evaluation Team was not the final determination by the Navy. The Navy provided each responsive offeror a chance to submit revised proposals and the Navy opened discussions with the two remaining proposers. Glenn Defense Marine was asked to respond to a series of questions, including eight questions related to past performance. The Primary Contracting Officer/Source Selection Authority noted:

> The PPET reviewed GDM's responses to the 8 past performance issues. Based upon GDM's responses, the PPET's overall rating for GDM did not change. The PPET determined that GDM's response to the past performance issue about subcontractor management satisfactorily resolved the concerns with that past performance issue. GDM's response to the other 7 issues did not satisfactorily resolve the past performance concerns raised by the PPET.

After discussions and a re-evaluation of the proposals, the Past Performance Evaluation Team's final evaluation found:

> Overall, the offeror was less than fully cooperative and did not demonstrate a commitment to service. The corrective actions taken have not demonstrated the of-

feror's effectiveness. Proposed corrective actions lacked sufficient details for the PPET to determine the offeror's effectiveness in addressing the deficiencies. Therefore, based upon the offeror's past performance record, it leads the PPET to expect marginal customer satisfaction and less than fully successful performance.

To conclude that it was unreasonable for the Navy to determine that the plaintiff's final past performance overall rating was Less than Satisfactory would suggest that the Navy should ignore concerns about past performance reported on the questionnaires, or other information available, and that Glenn Defense Marine had failed satisfactorily to address seven of the eight past performance concerns identified in the questionnaires and raised during discussions. It was proper for the Navy to consider the entire record of past performance submitted in accordance with the solicitation procedures and requirements, including the additional comments in the past performance questionnaires and the results of the discussions between the Navy and Glenn Defense Marine. The comments demonstrate that an overall past performance rating of Less than Satisfactory for Glenn Defense Marine was a legitimate choice, and was not arbitrary or capricious. The comments reflect past performance more aligned with the Past Performance Evaluation Team adjectives for Less than Satisfactory past performance than Satisfactory past performance. As noted above, Less than Satisfactory indicates a high performance risk and reflects that, "[t]he offeror's performance of previously awarded relevant contracts did not meet some requirements and provided marginal performance/quality results," and that "[t]he offeror's past performance record leads to an expectation of marginal customer satisfaction and less than fully successful performance." By contrast, Satisfactory past performance indicates a moderate performance risk and reflects that "[t]he offeror's performance of previously awarded relevant contracts met requirements and provided accepted performance/quality results," and "[t]he offeror's past performance record leads to an expectation of acceptable customer satisfaction and successful performance." A number of the comments indicated marginal customer satisfaction with plaintiff's past performance and less than fully successful performance, which the Navy was entitled to take into account when determining the final overall past performance rating for Glenn Defense Marine for Region 1.

In sum, there is a great deal of discretion afforded to the Agency with regard to evaluations of past performance, and the facts in each case present differently. Such discretion makes quantification for evaluation purposes difficult as many subjective, discretionary opinions are involved from numerous individuals. Overall ratings should be read in the context of the information available, including the internal comments included in the questionnaires to allow greater depth of understanding to the evaluators when making final contractor selections. The government has a responsibility to analyze all timely submitted information received in order to protect the taxpayers before the government expends funds from the Treasury.

■■■■ In addition, although certainly government officials can and do make mistakes, there is a strong presumption of the regularity accompanying government proceedings, including that the military generally carries out its responsibilities properly, lawfully and in good faith. *See Richey v. United States,* 322 F.3d 1317, 1326 (Fed.Cir. 2003); *Porter v. United States,* 163 F.3d 1304, 1316 (Fed.Cir.1998), *reh'g denied, en banc suggestion declined* (Fed.Cir.), *cert. denied,* 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999). The plaintiff bears the burden of overcoming the "strong, but rebuttable, presumption" that the military discharges its duties "correctly, lawfully, and in good faith." *Bernard v. United States,* 59 Fed.Cl. 497, 501 (quoting *Hary v. United States,* 223 Ct.Cl. 10, 17, 618 F.2d 704, 707 (1980) (citations omitted)), *aff'd,* 98 Fed.Appx. 860 (Fed.Cir. 2004).

The United States Court of Appeals for the Federal Circuit recently reiterated that, "[a]s we stated in *Rizzo,* ' "[t]he presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly

discharged their official duties." '" *Sickels v. Shinseki,* 643 F.3d 1362, 1366 (Fed.Cir. 2011) (quoting *Rizzo v. Shinseki,* 580 F.3d 1288, 1292 (Fed.Cir.2009) (quoting *Miley v. Principi,* 366 F.3d 1343, 1347 (Fed.Cir. 2004))). As noted in *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324:

> The cases also establish that, in determining whether to require an explanation, the agency decision is entitled to a presumption of regularity. *Bowen v. Am. Hosp. Assn.,* 476 U.S. 610, 626–27, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious. *Cf. United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (requiring a defendant asserting a selective prosecution claim to make a threshold showing in order to overcome the presumption of regularity of the agency decision to prosecute before the defendant is entitled to discovery). The litigant challenging that presumption necessarily bears a heavy burden.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1338 (footnote omitted); *see also Terry v. United States,* 103 Fed.Cl. 645, 653 (2012); *Tippett v. United States,* 98 Fed.Cl. 171, 177 (2011); *Alabama Aircraft Indus., Inc.-Birmingham v. United States,* 82 Fed.Cl. 757, 773 (2008) ("[A]gency decisions, including those of contracting officers, are entitled to a presumption of regularity, 'unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.' " (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1338)).

Each past performance analysis and re-evaluation if it occurs must rest on the facts presented by the particular case. In *Van-guard Recovery Assistance v. United States,* 101 Fed.Cl. 765, the protestor argued that the agency cannot contradict itself in a subsequent evaluation. The court noted, however, that "an agency has the right to change its mind in the course of an evaluation if it has good reason," *id.* at 786, and concluded that the Federal Emergency Management Agency had grounds to do so, if the Agency failed to identify an existing weakness in a proposal and went back to reevaluate and rescore a proposal. *Id.* Government contracts should be awarded for the right reasons, to the offeror who best meets the solicitation requirement as determined by the Agency. Agency evaluators must be allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation, including any modifications to the solicitation and the evaluation process is conducted in a manner fair to all offerors. In the case currently before the court, the Navy had sufficient reason to re-evaluate and revise the overall past performance rating after reviewing the comments in the references, especially after the Primary Contracting Officer/Source Selection Authority's suggestion to the Past Performance Evaluation Team to ensure that the correct overall rating was assigned, and after what the Agency deemed unresolved negative information following unsatisfactory discussions with plaintiff.

The decision in *Fort Carson Support Services v. United States,* 71 Fed.Cl. 571, also is instructive. In *Fort Carson,* all offerors, including the protestor Fort Carson Support Services, were assigned a low risk rating for the past performance and experience subfactor and for each element of past performance and experience in the Army's initial evaluation of past performance and experience. *See id.* at 598. As in the case before this court, the Agency " 're-validate[d] PPE [past performance and experience] information,' " *id.,* and the Army "determined that FCSS [Fort Carson Support Services] should receive only a 'Moderate' risk rating for the Managerial and Cost Control elements of PPE, and an overall PPE risk rating of 'Low/Moderate.' " *Id.* (internal citations omitted). The protestor argued that the

worsening of its risk rating for past performance and experience was arbitrary and capricious, because the second evaluation was based on the same information as the first evaluation. *See id.* The *Fort Carson* court started with the premise that " '[w]hen the Court considers a bid protest challenge to the past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency." ' " *Id.* at 598–99, 600 (quoting *Univ. Research Co. v. United States*, 65 Fed. Cl. at 505 (quoting *Gulf Grp. Inc. v. United States*, 61 Fed.Cl. at 351)). The court in *Fort Carson* indicated that review of past performance was within the Agency's discretion and "[u]nless such an action was forbidden by law, by the Solicitation, by the FAR, or by the SSP [Source Selection Plan], the Army was free to review proposals as many times as it felt it needed, so long as it treated all offerors fairly and equally." *Id.* at 599.

The court in *Fort Carson* noted that the Chairman of the Source Selection Evaluation Board explained, " 'the SSEB [Source Selection Evaluation Board] reconsidered the PPE information in light of the importance of the PPE Subfactor ... and in light of the fact that the Management Subfactor ratings and proposal risk assessments of the offerors were closer than they had been in the initial evaluation round.' " *Id.* at 581. The *Fort Carson* court indicated that, "without elaboration, he [Chairman of the Source Selection Evaluation Board] added that 'the SSEB found some instances in which it felt that its initial evaluations of PPE had been erroneous and made appropriate adjustments in this round.' " *Id.* at 600. Subsequently, the Source Selection Authority explained that " '[l]ooking beyond the ratings to the substantive information,' " the Source Selection Authority found the awardee to be "well above" Fort Carson Support Services in the past performance and experience subfactor assessment, that Fort Carson Support Services prime contracts were significantly less relevant than the awardee's contract and that Fort Carson Support Services' "ratings were considerably more mixed than either of the other two offerors." *Id.* Based on the record before it, and given the greatest deference possible that must be afforded to the agen-

cy's judgments in past performance evaluations, the court concluded that the assessment of past performance and experience of Fort Carson Support Services was not arbitrary, and that, "nothing contained in the underlying information and analysis contradicts the SSA's conclusions concerning PPE." *Id.; see also id.* at 601; *CRAssociates, Inc. v. United States*, 102 Fed.Cl. 698, 715 n. 16 (2011) (noting " 'it is certainly the Army's prerogative to change its mind—its failure to identify an existing weakness in a proposal does not preclude the Army from considering the weakness later.' " (quoting *Fort Carson Support Servs. v. United States*, 71 Fed.Cl. at 604)), *motion for stay pending appeal denied*, 103 Fed.Cl. 23 (2012); *Tech Sys., Inc. v. United States*, 98 Fed.Cl. 228, 248 (2011) (indicating "an agency's 'prerogative to change its mind' " (quoting *Fort Carson Support Servs. v. United States*, 71 Fed.Cl. at 604)).

 In the above captioned case, applying the same deferential standard, although dealing with a different set of facts, the court cannot conclude that the Navy's final evaluation of plaintiff was arbitrary, capricious or not in accordance with the law. In the protest now before the court, when discussing the initial evaluation of Satisfactory, the Primary Contracting Officer/Source Selection Authority informed the Board member, [deleted], that "[a]fter discussing this with the PPET Chairman, he agreed it was a borderline decision." The information included in the questionnaires in the initial Past Performance Evaluation Team's Summary Report and the draft pre-negotiation Business Clearance Memorandum demonstrated that there existed numerous concerns with respect to Glenn Defense Marine's past performance in the record leading to a selection decision. For example, included in the Satisfactory rating for the draft prenegotiation Business Clearance Memorandum, were the statements, "[t]here were multiple complaints about the GDM's customer service representative being less than responsive to Government inquiries," and "[t]here were many documented instances where GDM submitted pre-visit cost estimates (PCE) late. Also, many of the PCEs were incom-

plete when submitted." The initial Past Performance Evaluation Team report similarly noted that, "multiple delays in responsiveness prevented some ports visited as scheduled," and that "email responses from the offeror to questions raised by the contracting officer were routinely delayed and caused exacerbating the short lead time for arranging port visit services." The plaintiff has characterized [deleted]'s conduct, as a member of the Naval Supply System Command Contract Review Board, as an attempt to "insert an unjustified evaluation into the record." The plaintiff states: "Despite the fact that the CRB [Naval Supply System Command Contract Review Board] did not have before it all of the relevant evidence regarding GDMA's past performance, the CRB opined that the PPET's rating of GDMA was too high." It is the Navy's response and subsequent re-evaluation that is relevant here. The inquiry from the Board member alerted the Navy to the need to revisit the overall rating and determine if it was correct. The court will not overrule the Navy's judgment that a more complete evaluation for Glenn Defense Marine's past performance should attribute a Less than Satisfactory rating to the plaintiff.

Based upon all the ratings and comments in the past performance questionnaires, the analysis and review performed by the Past Performance Evaluation Team and the Primary Contracting Officer/Source Selection Authority, as well as the discussions between Glenn Defense Marine and the Navy, the court cannot conclude the plaintiff's final overall past performance rating of Less than Satisfactory was arbitrary or capricious. For example, the additional comments from the then-current, contracting officer, on Glenn Defense Marine's highly relevant contract, [deleted], noted that multiple negative past performance letters regarding performance under the highly relevant contract were sent to Glenn Defense Marine, responses from Glenn Defense Marine to "contract specialists are routinely delayed," and that plaintiff had failed to "provided a proposed pricing plan for insuring that non-priced items are offered at fair and reasonable prices." The Past Performance Evaluation Team's final evaluation noted deficiencies with Glenn De-

fense Marine's past performance "when it came to the reliability and consistency of its customer service practices, transparency in pricing and ease of communications," and noted that, "[o]verall, the offeror was less than fully cooperative and did not demonstrate a commitment to service," and "[t]he corrective actions taken have not demonstrated the offeror's effectiveness." The Primary Contracting Officer/Source Selection Authority also highlighted specific past performance issues with Glenn Defense Marine, such as, "[m]ultiple concerns were expressed by Government officials regarding key personnel's responsiveness to correspondence," and "proposed corrective action lacked sufficient details to determine their anticipated effectiveness."

In order to sustain a protest, a protestor also must demonstrate that it was prejudiced by the conduct and that there was a substantial chance it would have received the contract award, but for that conduct. *See Bannum, Inc. v. United States,* 404 F.3d at 1351; *see also Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562. Even with a Satisfactory rating for past performance, Glenn Defense Marine still would have had an inferior past performance rating as compared to MLS, and still would have had negative past performance comments in the record, which plaintiff did not challenge. As noted by the GAO, "[w]hile GDMA contends that its past performance rating should have been better than the Less than Satisfactory rating it ultimately received, we note that GDMA does not disagree with many of the negative remarks regarding its past performance." *In re Glenn Defense Marine–Asia PTE, Ltd.,* B– 402687.6, B– 402687.7, 2011 WL 6947628, at *7. The underlying problems identified on the past performance questionnaires and included in the Past Performance Evaluation Team evaluation and in the Primary Contracting Officer/Source Selection Authority's Business Clearance Memorandum were in the record. Despite the fact that Glenn Defense Marine was given an opportunity to fully address the eight concerns the Navy had identified in the plaintiff's proposal, the plaintiff failed to address

all the issues to the satisfaction of the Primary Contracting Officer/Source Selection Authority. Moreover, Glenn Defense Marine's rating of Less than Satisfactory was not the only reason it did not receive the award. As noted above, Glenn Defense Marine's past performance rating also was downgraded in Regions 2 and 3 to Less than Satisfactory, as in Region 1, but in both instances Glenn Defense Marine was awarded the contract. As discussed below, MLS' Better past performance rating, as opposed to the Satisfactory rating Glenn Defense Marine is arguing for, played an important role in MLS receiving the award. Even with a Satisfactory past performance rating, it is not at all clear a trade-off analysis would have resulted in plaintiff receiving the contract award.

*MLS*

In addition to challenging its own past performance evaluation, plaintiff alleges that the Agency's evaluation of the past performance of the intervenor MLS was arbitrary, capricious, an abuse of discretion, and not in accordance with law. Specifically, plaintiff asserts that "the PPET's determination that the past performance of MLS's subcontractors was 'highly relevant' and the PPET's assessment that these references supported an overall rating of 'Better' run counter to the facts before the PPET during its evaluation." For support that a flawed evaluation of MLS's overall rating resulted in a rating of Better for the intervenor, plaintiff argues that "[t]he sparse supporting comments on MLS's subcontractors' past performance questionnaires do not demonstrate a rational connection to the adjectival reference evaluations." Plaintiff also argues that "[t]he Agency's evaluation of MLS's past performance does not acknowledge that MLS's references provide no meaningful comments to explain or support their overall ratings." Defendant disagrees.

The court first notes that the plaintiff's position with respect to the evaluation of MLS is almost inverted from its arguments on the alleged flaws of the Past Performance Evaluation Team's conclusions regarding Glenn Defense Marine's proposal, which was based on opposition to relying on the additional narrative comments in the past performance questionnaires. Regarding its own evaluation, plaintiff argued the comments should not be allowed to override the overall ratings. With respect to MLS, however, plaintiff argues that the lack of comments on MLS past performance questionnaires should put into question the overall ratings assigned to MLS for past performance. Plaintiff is correct that some of the past performance questionnaires for MLS contained limited additional comments. For example, [deleted] rated [deleted] (one of MLS' subcontractors) overall performance on a highly relevant contract as Outstanding, and rated each area and every element, save one, as Outstanding ([deleted] rated performance within negotiated prices, an element of conformance to the terms and conditions of the contract, as Better). [Deleted]'s additional comments merely stated: "We have a general agreement to use [deleted] worldwide within very short notices. In most cases we use the service in emergency situations when we cannot rely on charterers agents and when we need a reliable and efficient partner looking after the actual problems with our vessels. Cooperation and ability to help us was always excellent." [Deleted], an evaluator for one of MLS' highly relevant subcontractor's reference, rated [deleted]'s overall performance as Better and assigned two ratings of Outstanding, two ratings of Satisfactory, and the remainder as Better for all of the elements. [Deleted], however, did not include any additional comments. [Deleted] also rated [deleted], and assigned an overall rating of Outstanding as well as Outstanding on every element. [Deleted]'s comments were: "We do not hold a contract with [deleted], our contract is with [deleted]. However, [deleted]has been the [deleted] approved agent since 2000. They have ensured all [deleted] vessel port calls and requested services meet the highest standard of operational/financial performance and ethical standards as required by the [deleted]." The final evaluator for [deleted], [deleted], assigned [deleted]'s overall performance as Better, and assigned a mixture of Outstanding and Better for the elements. His sole additional comment was "[deleted] has proven to be a competent and

helpful aid in delivering our cruise vessels operations in ports in India."

Each questionnaire also asked for a brief description of services, the place of performance, the value of the contract for each year, and provided space to evaluate the past performance with a series of objective ratings. In addition to an overall rating, all of the past performance questionnaires reviewed by the Past Performance Evaluation Team requested reviewers to rate each element of the four areas: level of capability, efficiency, and effectiveness; conformance to the terms and conditions of the contract; level of reasonableness and cooperation; and level of commitment to customer service.[24] The five ratings identified on the past performance questionnaire were: Outstanding, Better, Satisfactory, Less than Satisfactory, and Neutral, which were the same ratings that the Past Performance Evaluation Team used to rate an offeror's overall past performance.

 The past performance questionnaires for MLS might have been easier for the Agency to evaluate if they had included more pointed comments to better inform the Past Performance Evaluation Team. Given the objective rating system for each element of past performance, however, there was sufficient information to support the evaluation conclusions the Agency reached on MLS' proposal. Albeit after the fact, in a supplemental report, which is included in the Administrative Record before this court, filed by the Navy at the GAO to defend against Glenn Defense Marine's GAO protest, the defendant noted, "[w]hile the agency certainly prefers detailed past performance comments because they provide a more complete picture of a contractor's past performance,

detailed comments are not received in every instance." The Agency also indicated in the report to the GAO that the Past Performance Evaluation Team's "evaluation of the subcontractor's past performance considered the whole of the information on the comment forms—the description of the scope of the contractual work that had been performed, the overall rating for the contract's performance, the ratings for each of the factors/subfactors, and any narrative comments." The Navy supplemental report concluded: "The narrative statements, while helpful, were not the only information on which the past performance rating was based, rather, the whole of the information provided in response to the past performance queries was considered in determining the past performance rating." Based on the record before the court and the discretion due the Agency, the court cannot find that the Past Performance Evaluation Team was arbitrary or capricious in its evaluation of MLS' past performance.

Plaintiff also argues that the Navy's determination concluding that reference contracts for MLS' subcontractors were highly relevant was flawed. Plaintiff alleges that "[t]he Solicitation stated that the relevance of a past performance reference contract would be determined by whether the referenced contract was similar in scope, magnitude, and complexity to the Region 1 contract." The solicitation also stated that: "Past Performance is a measure of the degree to which an offeror satisfied its customers in the past by performing its contractual obligations on relevant directly related contracts and subcontracts (or partnerships or joint ventures) that are similar in scope, magnitude, and complexity to that required by the solicitation

24. As noted above, the following elements were associated with each area:

1. Level of capability, efficiency, and effectiveness; conformance to the terms and conditions of the contract:
a. Reliability and consistency of the company's key personnel
b. Capability to manage subcontractors
c. Capability of managing and controlling the contract
2. Conformance to the terms and conditions of the contract:
a. Performance within negotiated prices

b. Timeliness in providing goods or services in accordance with the contract schedule
3. Level of reasonableness and cooperation area:
a. Responsiveness to changes in requirements
b. Ease of communication
c. Timely response in dealing with problems and ability to find cost effective solutions
4. Level of commitment to customer service:
a. Evidence of business practices resulting in savings to the Government or to lower overall port visit costs

(completed within the past 3 years or currently in progress)." Furthermore, the solicitation stated that, "[i]n the case of an offeror whose past performance is somehow not similar in scope, complexity, or magnitude, or otherwise lacks relevance to some degree then the Government will take this into consideration and evaluate accordingly...." The determination of whether a contract was relevant or not for a past performance evaluation was within the discretion of the Navy. *See Linc Gov't Servs., LLC v. United States*, 96 Fed.Cl. 672, 718 (2010) ("Thus, when evaluating an offeror's past performance, the SSA 'may give unequal weight,' or no weight at all, 'to different contracts when the SSA views one as more relevant than another.'" (quoting *SDS Int'l v. United States*, 48 Fed. Cl. 759, 769 (2001))); *see also PlanetSpace, Inc. v. United States*, 92 Fed.Cl. 520, 539 ("At the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the SSA's considered discretion."), *subsequent determination*, 96 Fed.Cl. 119 (2010); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 364 (2009).

MLS' past performance matrix of contracts it had performed, and the contracts its subcontractors had performed, included 42 husbanding services contracts, and included contracts for its prospective subcontractors, [deleted]. The Navy concluded that the references for MLS' contracts, in which it was the prime contractor, were only moderately relevant. The Navy determined, however, that four of the references from its subcontractors were on highly relevant contracts. The solicitation expressly discussed the potential role of including subcontractors for the past performance evaluation, requiring that a potential offeror include any contractors it intended to use as a subcontractor for husbanding and submit the same past performance information for each subcontractor that it submitted for itself. The solicitation stated that:

> The past performance information requirements for subcontractors are similar to the past performance information requirements for contractors. Information about the contracts and subcontracts that the proposed subcontractor is currently performing or has performed within the last three years that are similar in scope, magnitude and complexity to the tasks the subcontractor will be called upon to perform under the contract.

Plaintiff alleges that the "record in this case offers no explanation as to how the Agency could conclude that MLS's subcontractors' past performance was 'highly relevant' when the evidence before the Agency was devoid of even the most basic information regarding the scope, complexity, and magnitude of these contracts." Citing to the defendant's opening brief, plaintiff also alleges that the determination regarding the four contracts performed by MLS's subcontractors' [deleted] and [deleted] as "highly relevant" "was based entirely on their geographic location and not on additional information regarding the magnitude, scope, and complexity." At oral argument defendant conceded, "[t]he record is weak with respect to the basis for the evaluation of MLS's contracts as relevant." In its filings defendant argues, however, that the record demonstrates "the missing information did not detract from the PPET's ability to understand that the references had knowledge concerning the contractors, the contracts had been performed in South Asia, the contracts concerned providing commercial husbanding services for transiting ships, and the references were well satisfied with the performance they had received."

Moreover, defendant maintains that the entire basis of the highly relevant decision did not rest solely on geography, as is demonstrated in the record before this court and at the GAO. For example, the overall and internal ratings offered significant, comprehensive information. Defendant also cites to the conclusions of the GAO as a good summary of why the highly relevant rating given to MLS's contracts was not limited to geography:

> We first note that the record shows that the past performance of MLS's subcontractors were [sic] for husbanding services at many of the same ports as those covered by this contract. In addition, the services performed by the subcontractors

were for a variety of sizes of vessels that spend the majority of their useful life traveling from port to port rather than remaining berthed at a home location. As here, the subcontractors had to provide services on short notice, and be prepared for frequent ship schedule changes. The subcontractors also had to have flexibility and be able to provide varying services depending on the type of ship that comes into port. *In re Glenn Defense Marine–Asia PTE, Ltd.*, B– 402687.6, B– 402687.7, 2011 WL 6947628, at *8. The supplemental report filed by the Navy at the GAO to defend against Glenn Defense Marine's GAO protest, included as part of the Administrative Record before this court, also noted that "[t]he subcontracts that MLS provided for consideration as past performance information are highly relevant to the requirements included in the solicitation because they require services that are similar in scope, magnitude, and complexity." The Administrative Record reflects the supplemental statements by the Navy that those subcontracts:

> require services at many of the same ports as those covered in the contract, they require services on a variety of size vessels (the Navy vessels that can order services under the contract at South Asia ports are also of various sizes) that spend the majority of their useful life, as do Navy ships, traveling from port to port rather than remaining berth at a home location, they require the capacity to provide services on short notice and to be prepared for frequent ship schedule changes, they require flexibility and varying services depending on the type ship that comes into port, they require the ability to manage port visits that tend to attract attention because of the international status of the ship's owner, and they require coordination with ordering officers and home office contracting organizations located away from India.

Although important, geography was not the only basis on which the Navy determined relevancy of previous contracts for the past performance evaluations.

 Plaintiff also argues that none of the highly relevant contracts were for husbanding services to military vessels. The plain-

tiff, however, does not point to a requirement in the solicitation that required highly relevant contracts to be for servicing on military vessels. Moreover, in addition to the lack of such a requirement, as noted in the pre-negotiation business clearance memorandum, for the highly relevant references, "[t]hese contracts were considered of high relevance since performance was in the countries of India and Sri Lanka—two of the contracts supported military vessels, the other six contract [sic] supported commercial customers." Also, as noted at the GAO, "the past performance of MLS's subcontractors were [sic] for husbanding services at many of the same ports as those covered by this contract." *In re Glenn Defense Marine–Asia PTE, Ltd.*, B– 402687.6, B– 402687.7, 2011 WL 6947628, at *8. The court, therefore, concludes, based on the record, that it was not arbitrary to identify the MLS' subcontractors' contracts as highly relevant references. Moreover, deference is due the Agency decision, absent a showing of sufficient, negative information in the record to call the Agency's determination into question. *See Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. at 785 (It is a " 'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference.' " (quoting *Al Andalus Gen. Contracts Co. v. United States*, 86 Fed.Cl. at 264)).

Plaintiff further alleges that the Past Performance Evaluation Team "violated a clear Solicitation requirement," namely Section 8.2.4 of the solicitation. Section 8.2.4 stated:

> In the case of an offeror whose past performance is somehow not similar in scope, complexity, or magnitude, or otherwise lacks relevance to some degree then the Government will take this into consideration and evaluate accordingly (for example, a "customer" may give an offeror "outstanding" on its performance on the customer's contract, but if the contract in question is smaller or otherwise lacks relevance, then the overall rating given by the Government may be adjusted as it is less relevant).

The plaintiff argues that:

> Despite this clear instruction [in Section 8.2.4] that only past performance refer-

ences that were somehow not relevant could be downgraded, here the Agency effectively downgraded GDMA's past performance references (by ignoring their overall ratings) despite the fact that they were all found either to be "highly relevant" or "moderately relevant." Under the terms of the Solicitation, the PPET had no authority to ignore the "Satisfactory" and "Better" ratings assessed by the references for the contract deemed "highly relevant" because there were no meaningful differences in the scope, complexity, or magnitude of this contract.

The government, by contrast, argues that, "the Solicitation did not limit the PPET's authority to overrule the overall ratings of relevant past performance references to circumstances where it found that the reference was not similar in scope, complexity, or magnitude, or otherwise lacked relevance." The government correctly observes that "[w]hile recognizing the importance of relevance, this section of the Solicitation made no representation that the PPET or the SSA would be bound by the overall ratings provided by a customer or other reference in situations in which contract relevance was not an issue," or to "limiting the extent to which the Navy can consider the comments included by the references as part of their questionnaires." The government properly concludes that Section 8.2.4 "simply provided notice that past performance on less relevant contracts, regardless of the rating, would be given less consideration than past performance on more relevant contracts." The court agrees with the defendant. The Navy was not limited by Section 8.2.4 to overall ratings assigned by the past performance references or limited in reviewing the additional comments. The government has an obligation to review the relevant materials and is not limited by the references' overall ratings. Moreover, Section 8.2.4 is permissive, it stated that "the overall rating given by the Government *may* be adjusted as it is less relevant." (emphasis added). The Past Performance Evaluation Team, and the Navy, had the ability to look beyond the labels and determine which contract references were the most relevant and

which comments best explained the past performance of each offeror.

Plaintiff also alleges that:

If the PPET had applied § M.8.2.4 [solicitation Section 8.2.4] equally to both GDMA and MLS, it would have accepted, without downgrading, the overall ratings assigned by *both* GDMA's and MLS's references. By ignoring the ratings provided by GDMA's references and accepting those provided MLS's references, the Agency unequally applied § M.8.2.4. The PPET provided no explanation of its unequal application of § M.8.2.4, and nothing in the record indicates it even considered the issue of how this evaluation treatment was reasonable and in accordance with the Solicitation.

(emphasis in original). Defendant argues that the Navy's past performance evaluation was consistent with Section 8.2.4 of the solicitation and notes that, "[t]he comments from the references on the highly relevant contract were appropriately given more weight than the comments concerning the moderately relevant contracts." In fact, the Past Performance Evaluation Team appears to have given more weight to the highly relevant reference than the moderately relevant references. For example the revised Past Performance Evaluation Team Summary Report regarding Glenn Defense Marine noted: "Although there were some 'Outstanding' ratings provided by offeror's references on the offeror's past performance (*i.e.*, individual area questions), those positive ratings were not necessarily substantiated by convincing arguments unlike several 'Less than Satisfactory' ratings. Additionally, some of those Less than Satisfactory ratings were of the highly relevant contract, and the performance risk is significantly high." The Past Performance Evaluation Team similarly gave more deference to the Outstanding rating of the highly relevant reference for MLS' past performance. Plaintiff has not demonstrated the Navy violated Section 8.2.4 as alleged.

Given the identified, individual strengths noted regarding MLS' past performance, and that of its subcontractors, even if the Navy improperly weighted the subcontractor contracts, it is not clear that the overall result

would have changed or that MLS would not have received a higher overall past performance rating than Glenn Defense Marine. In all of the MLS' evaluations, only strengths were identified and no past performance problems were documented. For example, in its final evaluation, the Past Performance Evaluation Team noted in its summary notes regarding MLS, in addition to its narrative assessment for each element, that:

> For Region 1, this offeror's past performance on previously awarded relevant contracts met or exceeded the [sic] most requirements. The offeror was very responsive to customer service issues, provided timely services, flexible when responding to changes in requirements, maintained control over managing subcontractors, was transparent in its pricing processes and was effective in communications. Overall, the offeror was very cooperative and demonstrated a commitment to customer service. There were no substantiated problems or issues documented in this past performance assessment. Therefore, based upon the offeror's past performance record, it leads the PPET to expect a strong customer satisfaction and fully successful performance.

Despite the above, the final revised evaluation determination for MLS' past performance was Better, rather than Outstanding, the contracting officer explained the difference as, "[a]fter discussing this with the PPET chairman, although there were no past performance issues for MLS, the references provided feedback that didn't substantiate the higher OUTSTANDING rating." The above not only demonstrated the very high level of past performance by MLS, but shows the Past Performance Evaluation Team did not only review and consider negative comments from Glenn Defense Marine's past performance questionnaires, but also from MLS' past performance questionnaires. The difference between the two is the negative comments prevented MLS from achieving an Outstanding past performance rating and was left with a still impressive, Better, overall past performance rating; whereas for Glenn Defense Marine, the negative feedback resulted in a lowering of the overall rating

from Satisfactory (still below MLS) to a rating of Less than Satisfactory.

**Best Value Trade–Off**

Plaintiff also argues that "[t]he Agency's best value determination is arbitrary, capricious, an abuse of discretion, and contrary to law." Defendant responds that "the Court should not overturn the Navy's best value trade-off decision awarding the contract to MLS," arguing, "[t]he record fully supports the best value decision in this case, which reasonably reflects the Navy's evaluation of the relative merits of the proposals, consistent with the Solicitation."

The FAR at 48 C.F.R. § 15.101–1 describes the best value process as:

> (a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.

> (b) When using a tradeoff process, the following apply:

> (1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and

> (2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.

> (c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

48 C.F.R. § 15.101–1. Describing the documentation needed for a best value trade-off analysis, 48 C.F.R. § 15.308 states:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection

decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (current through May 17, 2012).

The United States Court of Appeals for the Federal Circuit in *E.W. Bliss Co. v. United States*, noted that:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H*, 75 F.3d 1577 (Fed.Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder")....

*E.W. Bliss Co. v. United States*, 77 F.3d at 449 (citations omitted); *see also Banknote Corp. of Am. Inc. v. United States*, 365 F.3d at 1355 (citing *TRW, Inc. v. Unisys Corp.*, 98 F.3d at 1327–28) ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."); *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed.Cl. 488, 514 (2009); *Akal Sec., Inc. v. United States*, 103 Fed.Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting *E.W. Bliss Co. v. United States*, 77 F.3d at 449)). The Federal Circuit also has indicated that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1330.

■ It is established that "a plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" *Brooks Range Contract Servs., Inc. v. United States*, 101 Fed.Cl. 699, 707 (2011) (quoting *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed.Cl. at 503); *see also Matt Martin Real Estate Mgmt. LLC v. United States*, 96 Fed.Cl. 106, 113 (2010); *Serco v. United States*, 81 Fed.Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors."). Summarizing the challenge a protester faces in contesting a best value determination, a Judge of the Court of the Federal Claims stated:

The plaintiff in a bid protest thus "bears a heavy burden." *Impresa*, 238 F.3d at 1333. That burden lies heavier still when the plaintiff challenges a contract award made subsequent to negotiated procurement, where the procurement official is entrusted with "especially great discretion, extending even to his application of procurement regulations." *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed.Cir.2002). Greater yet is the procurement official's discretion when selecting a contract-awardee on the basis of a best value determination rather than price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004). Of course, as courts have repeatedly observed, the greater the procurement official's vested discretion, the higher the threshold for finding the official's decision irrational or otherwise unlawful. *See, e.g., id.; Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct.Cl.1980); *Cygnus Corp., Inc. v. United States*, 72 Fed.Cl. 380, 384–85 (2006) [*aff'd*, 227 Fed.Appx. 909 (Fed. Cir.2007)]. An agency's contract award is thus least vulnerable to challenge when based upon a best value determination. *See Galen Med. Assocs.*, 369 F.3d at 1330.

*PlanetSpace Inc. v. United States*, 96 Fed.Cl. 119, 125 (2010).

■ Generally speaking, the United States Court of Federal Claims "will not disturb an agency's best value decision merely because a disappointed bidder disagrees with the agency's analysis," *Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed.Cl. at 515, but if "ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious." *Bay-First Solutions, LLC v. United States,* 102 Fed.Cl. 677, 695 (2012) (citing *Huntsville Times Co. v. United States,* 98 Fed.Cl. 100, 119 (2011)); *Serco Inc. v. United States,* 81 Fed.Cl. at 497 ("Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise.") (footnote omitted); *see also FirstLine Transp. Sec., Inc. v. United States,* 100 Fed.Cl. at 381 ("when selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the government to simply state that a proposal's technical superiority is not worth the payment of a price premium. Instead, the government must explain specifically *why* it does not warrant a premium.") (emphasis in original). The FAR at 48 C.F.R. § 15.308, however, does require the government to document the reasons for selecting the higher priced offeror. *See* 48 C.F.R. § 15.308 ("the documentation need not quantify the tradeoffs that led to the decision."). In *Akal Security, Inc. v. United States,* 103 Fed.Cl. 310, the court noted, however, that, "[u]nderstandably, the United States Court of Federal Claims has declined to venture too far into the weeds of most bid protests that are factually driven." *Id.* at 332. "In performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors." *Serco Inc. v. United States,* 81 Fed.Cl. at 497 (citing 48 C.F.R. § 15.308).[25]

■ Plaintiff's main argument that the Agency's best value determination was arbitrary, capricious, an abuse of discretion, and contrary to law, seems to stem from its belief that the past performance evaluations of Glenn Defense Marine and MLS were flawed. Yet the court already has determined that the past performance evaluations of Glenn Defense Marine and MLS were not arbitrary, capricious, an abuse of discretion, or contrary to law. As to whether the Navy sufficiently documented its decision to accept the higher price, the Primary Contracting Officer/Source Selection Authority first noted that only Glenn Defense Marine and MLS had submitted proposals in the competitive range, had submitted acceptable security plans, "did not receive any unacceptable ratings for non-price factors, submitted complete proposals, and did not take any exceptions to the terms and conditions contained within the solicitation." Therefore, the Agency concluded that the trade-off analysis would be limited to those two offerors. The Primary Contracting Officer/Source Selection Authority noted that: "The trade-off process outlined below is in accordance with FAR 15.101–1, the solicitation, and SSP [Source Selection Plan]. The evaluation assesses each offerors technical approach and past performance as a means of evaluating the offerors ability to successfully meet the requirements of the solicitation. The analysis compares offerors' non-price factors (i.e., technical approach and past performance and price)."[26] The Primary Contracting Offi-

---

**25.** The facts in *Serco* are an example of the extent to which it can be a heavy burden for a plaintiff to overturn an Agency's trade-off analysis. The *Serco* court overturned the trade-off analysis, but only after the court noted that the Agency was willing to pay a premium of as much as $3.6 million for a technical ranking advantage of a mere one-tenth of a point, and the Source Selection Authority failed to explain if the difference in technical scores resulted in a real technical superiority, failed to perform any cost/benefit comparisons, and failed to explain why, as required by the solicitation, the supposed added value of the more expensive proposal was worth the extra cost. *See Serco v. United States,* 81 Fed.Cl. at 498.

**26.** The solicitation stated that "[t]he Government will use the trade-off process described in FAR 15.101 –1," and that "[t]he evaluation will assess the offeror's Technical Approach and Past Performance. This assessment will be used as a means of evaluating the offeror's ability to successfully meet the requirements of the solicitation."

cer/Source Selection Authority continued, "[t]he following factors, in order of importance, were used to evaluate the acceptable offers: technical approach; past performance; and price. The non-price factors, when combined, are significantly more important than price."

The Primary Contracting Officer/Source Selection Authority's analysis revealed that both offerors received a Better rating for technical approach, noted many of the strengths were the same for both offerors and identified an individual technical strength for each offeror, before concluding that the offerors were equal in their Technical Approach. The Primary Contracting Officer/Source Selection Authority also indicated a "significant difference" between the past performance of MLS, which was rated as Better and which had no performance concerns and Glenn Defense Marine, which was rated as Less than Satisfactory, and had "past performance issues regarding responsiveness to Government inquiries, late and/or incomplete pre-port visit cost estimates, lack of transparency into prices that were not pre-priced in the contract and communications difficulties." MLS also was identified as "responsive with solutions and providing a very high level of customer service." The Primary Contracting Officer/Source Selection Authority, therefore, decided the contract should be awarded to MLS, despite MLS's price coming in 63.8% higher than that of Glenn Defense Marine. A table of the final evaluations indicates:

| Offeror | Evaluated Price | Technical | Past Performance | Security Plan |
|---|---|---|---|---|
| **Glenn Defense Marine** | $1,548,200.00 | Better | Less than Satisfactory | Acceptable |
| **MLS** | $2,537,414.00 | Better | Better | Acceptable |
| **Independent Government Estimate** | $[deleted] | | | |

MLS' price of $2,537,414.00 in its revised proposal was $989,214.00 higher or approximately 64% higher than Glenn Defense Marine's price of $1,548,200.00 in its revised proposal. The Primary Contracting Officer/Source Selection Authority stated that since Glenn Defense Marine's total evaluated price is $989,214.00 lower than MLS' total evaluated price, "a trade-off analysis is required to determine the 'best value' proposal that will be the most advantageous to the Government."

The Primary Contracting Officer/Source Selection Authority concluded, "[t]he Contracting Officer has determined MLS's proposal to be the 'best value' and most advantageous to the Government," and identified three specific perceived benefits which warranted the higher cost of MLS' proposal: performance risk, pricing transparency, and contract administration. Regarding performance risk, the Primary Contracting Officer/Source Selection Authority stated that Glenn Defense Marine had fallen short of meeting contract requirements related to contract administration for "timely and accurate pre-port visit estimates, transparency in pricing matters, and communications," all of which the Primary Contracting Officer/Source Selection Authority indicated were "very important for the successful delivery of husbanding services."

The Primary Contracting Officer/Source Selection Authority also indicated that as it related to past performance, Glenn Defense Marine had "significant deficiencies in meeting both pricing submission requirements as well as responding in a timely manner to facilitate pricing transparency." This was of particular concern to the Primary Contracting Officer/Source Selection Authority because of the high number of requirements which were not pre-priced in the contract. According to the Primary Contracting Officer/Source Selection Authority, up to $7,000,000.00 out of the estimated $10,000,000.00 total contract value potentially could be non-pre-priced items, such as port tariffs, fuel, provisions and incidentals. Although conceding that Glenn Defense Marine had an adequate system and process to ob-

tain fair and reasonable prices for non-priced items, the Primary Contracting Officer/Source Selection Authority concluded that Glenn Defense Marine's past performance "indicates that attempts by the Government to obtain pricing information from GDM for items not pre-priced in previous relevant contracts were never adequately addressed to the Government's satisfaction," even after discussions between the Navy and Glenn Defense Marine.

By contrast, the Primary Contracting Officer/Source Selection Authority determined that "pricing transparency has been an area where MLS has clearly excelled," noting their "long and established past performance history of going above and beyond the minimum contract requirements to substantiate non-priced items through a very robust information system developed specifically for this purpose." The Primary Contracting Officer/Source Selection Authority concluded that there was a "very high degree of confidence" that MLS would not only exceed the pricing transparency requirements, but through the specifically designed online pricing application, provide additional benefits to the Navy related to invoicing, data mining and other analytic tools.

Finally, the Primary Contracting Officer/Source Selection Authority analyzed contract administration and indicated that additional contract administration costs would likely be required if a contract were awarded to Glenn Defense Marine, stating that "a conservative estimate of enhanced contract oversight and management that would be required by Government to mitigate the risks would be hundreds of thousands of dollars over a five-year period." The Primary Contracting Officer/Source Selection Authority specifically noted Glenn Defense Marine's "late pre-port cost estimates, lack of a response to correspondence, and pricing issues." As applied to the contract to be awarded, the Primary Contracting Officer/Source Selection Authority concluded that Glenn Defense Marine's potential lack of responsiveness "not only increases the contract administration costs to the Government, but also could jeopardize the mission of the U.S. Navy since much of this correspondence was in relation to an upcoming ship visit where timely communication is critical to Government decision makers."

Plaintiff cites to *FirstLine Transportation Security v. United States,* 100 Fed.Cl. 359 to support its argument that the best value trade-off analysis was arbitrary and capricious. In *FirstLine,* the court determined that the Source Selection Evaluation Board best value analysis, not only was insufficiently documented, but was irrational and contrary to the request for proposals because "the SSEB [Source Selection Evaluation Board] minimized the substantial differences between the proposals, which had the effect of elevating the relative importance of price in its best-value tradeoff analysis," and which "had the effect of converting the best-value procurement contemplated under the RFP into one based on low price and mere technical acceptability." *Id.* at 376. Therefore, the *FirstLine* court concluded, "[b]ecause the SSEB's best-value analysis was inconsistent with the RFP, it was irrational and contrary to law." *Id.* In *FirstLine,* the court determined that by "minimizing the importance of the non-price factors, and thus elevating the relative importance of price, the SSEB deviated from the requirements of the RFP, which required a best-value procurement," and that "the government has essentially conducted this procurement on a lowest-price technically acceptable basis." The *FirstLine* court further noted "it is clear that the SSEB failed to account for the significant differences between the competing proposals with respect to technical quality," to which the court could not "fathom how the SSEB could have reached the conclusion that the First-Line proposal was only 'moderately better' than the [winning bidder's] proposal." *Id.* at 377.

Although the plaintiff tries to draw a parallel between *FirstLine* and the above captioned protest, arguing "[t]he flaws in the SSEB's best-value tradeoff analysis in *First-Line* are present in this case," the two cases are not alike. In the above captioned case, the solicitation specifically stated, "[t]he following factors, in order of importance, shall be used to evaluate acceptable offers: Technical Approach, Past Performance, and Price.

The non-price factors, when combined, are significantly more important than price." In the protest before the court, the solicitation instructed the Navy to "compare offerors' non-price factors (i.e., Technical Approach and Past Performance) and Price," and stated that "[c]onsistent with the trade-off process, the Government will consider award to other than the lowest priced offeror or other than the highest rated non-price factors offeror. The Government may accept other than the lowest priced proposal." The Navy followed these directives and concluded that MLS had superior past performance, for the specific reasons identified by the Past Performance Evaluation Team in the Business Clearance Memorandum, and applied the defects it identified for plaintiff in the trade-off analysis. The Past Performance Evaluation Team and the Business Clearance Memorandum, in particular, identified specific reasons for Glenn Defense Marine's Less than Satisfactory past performance rating, which justified the Agency decision. The Navy adequately documented the trade-off analysis and reasons for its conclusion that MLS provided the Navy with the best value, despite its higher price. The Navy followed the requirements of the solicitation when conducting the best value trade-off analysis and when awarding the contract to MLS.

The plaintiff also argues that the Primary Contracting Officer/Source Selection Authority's statement that Glenn Defense Marine's past performance indicated that its performance of the contract would impose costs of " 'hundreds of thousands of dollars over a five-year period' also was arbitrary, capricious, and an abuse of discretion." Plaintiff states, "[i]n the absence of any explanation showing how GDMA's past performance would likely result in hundreds of thousands of dollars in increased costs (effectively decreasing the evaluated price difference between GDMA and MLS), the PCO/SSA's [Primary Contracting Officer/Source Selection Authority's] determination lacks a reasonable basis." Defendant, however, correctly notes that the language quoted by plaintiff, that Glenn Defense Marine's past performance would cost "hundreds of thousands of dollars over a five-year period," "is misleading because it is incomplete." Al-

though addressed above, in the documentation of the potential benefit of MLS' contract administration, the entire paragraph of the trade-off analysis regarding contract administration states:

> **Contract Administration**—GDM's past performance leads the Contracting Officer to believe that additional contract administration costs would be required if a contract were awarded to GDM rather than MLS. Although the additional administrative costs are not easily quantifiable, a conservative estimate of enhanced contract oversight and management that would be required by Government to mitigate the risks would be hundreds of thousands of dollars over a five-year period. There were noted instances where contracting personnel were required to follow-up with GDM on important matters, such as inquiring about late pre-port cost estimates, lack of a response to correspondence, and pricing issues. GDM's lack of responsiveness not only increases the contract administration costs to the Government, but also could jeopardize the mission of the U.S. Navy since much of this correspondence was in relation to an upcoming ship visit where timely communication is critical to Government decision makers.

(emphasis in original).

The Primary Contracting Officer/Source Selection Authority was not required to assign an exact amount to quantify the impact of plaintiff's past performance on future contract performance. *See Serco Inc. v. United States,* 81 Fed.Cl. at 497 (citing 48 C.F.R. § 15.308) ("in performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors."); *see also Fort Carson Support Servs. v. United States,* 71 Fed.Cl. at 598. The Primary Contracting Officer/Source Selection Authority also gave specific examples as to why Glenn Defense Marine's past performance could impact the cost to the Navy if the contract under consideration was awarded to plaintiff. Moreover, in a bid protest review, addressing a past performance evaluation and a best value trade-off analysis, this court must accord

considerable deference to the Agency. The plaintiff has not met its substantial burden of proof and cannot prevail. Based on the foregoing, this court concludes that the Navy's best value determination in selecting MLS for contract award over Glenn Defense Marine was reasonable, in compliance with the solicitation's evaluation criteria and applicable law, not arbitrary or capricious and in accordance with law. Because the court also has determined that the past performance evaluations of Glenn Defense Marine and MLS had a rational basis, the court does not reach the issue of injunctive relief.

## CONCLUSION

For the reasons discussed above, the Navy's past performance evaluations for Glenn Defense Marine and MLS were not arbitrary, capricious or not otherwise in accordance with law. Moreover, the best value trade-off analysis had a rational basis, resulting in an award of the contract to MLS. Therefore, plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross-motion for judgment on the administrative record is **GRANTED.** Plaintiff's complaint is **DISMISSED.** The Clerk's Office shall enter **JUDGMENT** consistent with this opinion

**IT IS SO ORDERED.**